**H.M. STICKLE, G. Martinez, I.M. Garcia, J.M. Davis, and B.M. Goodstein, and Double JJ Corporation-La Hacienda Mexican Food Machinery, Appellees,**

v.

**HEUBLEIN, INC., Appellant.**

**Appeal No. 83-577.**

United States Court of Appeals Federal Circuit.

Sept. 15, 1983.

to establish that it had a license, express or implied, to make and use three high-speed taco shell fryers and, thus, that Heublein infringed all of the claims asserted in the four patents in suit.[1] The district court entered a permanent injunction against Heublein's making, using or selling infringing fryers, including the fryers in suit, and awarded damages in the amount of $1.485 million based on a "reasonable royalty" of 4.2% of Heublein's sales price for taco shells. The district court further held that this was "an exceptional case" warranting awards of prejudgment interest and attorney fees. The holding of infringement and the scope of relief are challenged on appeal. Heublein also appeals from the dismissal of its counterclaims which sought damages against one of the appellees, Double JJ Corporation-La Hacienda Mexican Food Machinery (La Hacienda), for breach of contract. We have jurisdiction under 28 U.S.C. § 1295(a)(1). We affirm-in-part, reverse-in-part, and remand.

C. Lee Cook, Jr., of Chicago, Ill., argued for appellant. With him on brief were John J. McHugh and John E. Noel. Steven J. Bosses, New York City, of counsel. Edward W. Lincoln, Jr., Farmington, Conn., of counsel.

R.W. Johnston, Pasadena, Cal., argued for appellee. With him on brief was Leo J. Young, Pasadena, Cal.

Before NICHOLS, KASHIWA and NIES, Circuit Judges.

NIES, Circuit Judge.

Heublein, Inc., (Heublein) appeals from the final judgment of the United States District Court for the Western District of Wisconsin which held that Heublein failed

I

*Background*

Daniel T. Stickle (Stickle), now deceased, was the inventor of the inventions covered by the patents in suit and the founder and president of La Hacienda, a manufacturer of taco shell frying machines located in Lubbock, Texas.

Taco shells are made by forming and baking a tortilla, a thin corn pancake, which is then folded and deep fried to make it crisp. For the commercial production of tacos, ovens which bake several tortillas at a time, and fryers which fold and fry the tortillas automatically, are utilized. The instant dispute concerns only the latter part of this operation. An early type of fryer used a spinning wheel which turned the tortillas through hot oil (J.C. Ford fryers).

---

1. The four patents in suit are: (i) U.S. Patent No. 3,785,273, issued January 15, 1974, to Daniel T. Stickle for "Taco Shell Machine"; (ii) U.S. Patent No. 3,928,638, issued December 23, 1975, to Daniel T. Stickle for "Method of Making Taco Shells"; (iii) U.S. Patent No. 4,154,-153, issued May 15, 1979, to Daniel T. Stickle for "Drive Mechanism for a Mechanized Taco Shell Fryer"; and (iv) U.S. Patent No. 4,160,043 issued July 3, 1979, to Daniel T. Stickle (deceased) by Hortencia M. Stickle, executrix, for "Method of Making Taco Shells."

The patents will be referred to as the '273, '638, '153, and '043 patents, respectively.

Fryers developed by Stickle use an endless mesh belt, on which tortillas are passed and driven through a tank of hot cooking oil. The early Stickle fryers had a production capacity of approximately 200 dozen shells per hour, which was almost double the capacity of the J.C. Ford fryers. The Stickle fryers underwent several phases of evolution and, ultimately, produced about 2000 dozen shells per hour. Notably, however, all of the various Stickle fryers utilized the inventions claimed in the Stickle patents in suit.

Zapata Foods, Inc., (Zapata) operated a taco shell production facility in Stoughton, Wisconsin. By 1972, Zapata had replaced all of its J.C. Ford fryers with Stickle fryers. Moreover, Stickle and the management at Zapata, particularly Sheldon Hanson, had developed a close business and personal relationship and were able to conduct matters on a rather informal basis. In mid-1974, when Heublein purchased Zapata, Hanson remained in his position. Notwithstanding Heublein's acquisition of Zapata, the close relationship between Hanson and Stickle appears to have remained firm. During the following year, Heublein acquired more 2-row Stickle fryers.

In 1975, no taco shell production line was fully automated. Tortillas still had to be moved from the oven onto the fryer belt by hand. During that year, Heublein decided to develop a fully automated taco shell production line. Due to the experimental nature of this new line, Stickle's acknowledged expertise in taco shell fryers, and the long prior association between Zapata and Stickle, Heublein chose Stickle to design, and then to supply, a high-speed 4-row fryer which was to produce more than 2400 dozen shells per hour. The fryer also had to include an infeed stage, in synchronization with previous operations, which would place the tortilla on the fryer belt thereby replacing the hand-feeding of the fryer. This new fryer was denominated the HUB–2000.

To develop its automated production line, Heublein secured engineering assistance and guidance from independent consultants. These designers worked closely with Stickle on development of a high-speed 4-row fryer for the line. By a purchase order dated July 21, 1976, Heublein ordered the first HUB–2000 from La Hacienda at a purchase price of $89,500. The purchase order set forth, *inter alia*, the operating requirements for the fryer including the infeed, as discussed above.[2]

La Hacienda and Heublein subsequently executed a written agreement on October 5, 1976. In that agreement, which incorporated the earlier purchase order, La Hacienda expressly warranted that the HUB–2000 would meet the operating requirements set out in the purchase order. The agreement further provided that La Hacienda would

> manufacture and sell to [Heublein] such number of additional fryers, if any, as [Heublein] shall order ... for $79,500 each, it being understood, however, that [Heublein] has no obligation whatsoever to purchase any additional machines.

By an explicit provision in the contract, La Hacienda also agreed that it would not "manufacture and sell the fryer ... to any other party," a provision from which La Hacienda subsequently sought release.

Heublein asserts that three automated lines had been contemplated for the Stoughton facility from the outset and that Stickle was aware in undertaking the agreement to supply fryers that Heublein's plans required at least three.

In February 1977, three months after the scheduled delivery date, Stickle personally delivered the fryer to Heublein's plant in Stoughton, Wisconsin. Heublein contends that the delivered fryer did not live up to the specifications and was plagued with problems. One clearly evident problem was that the infeed stage did not properly load

---

**2.** The district court may have failed to appreciate that the fryer included the infeed. Finding of Fact No. 11 states:

> The first fryer was to be incorporated into defendant's developing experimental high-

speed line which also included, among other things, apparatus for forming raw tortillas from masa, an oven for baking tortillas, a steam chamber, and an infeed device.

the tortillas onto the fryer belt. The record is unclear whether the loading problem was due to defects in the HUB–2000 or to the additional step in the production line of steaming the tortillas between baking and frying, which made them sticky and hard to handle. It is also unclear whether Heublein failed to inform Stickle that the tortillas would be steamed. In any event, there were a number of discussions between Hanson and Stickle about the unsatisfactory performance of the HUB–2000.

The district court found that Hanson told Stickle that Heublein was experiencing "some problem" with the infeed and the drive system and that this communication was made "shortly after receipt of the fryer." Nevertheless, the district court found that Heublein did not give La Hacienda notice of a breach of warranty and further found that:

> An understanding was reached between defendant and Dan Stickle whereby defendant was to undertake correction of whatever problems it perceived in the fryer and would retain the $9,500 defendant still owed La Hacienda for the first fryer to cover the cost of such modifications and as an offset for any start-up difficulties.

Heublein ultimately corrected most of the problems at a purported cost of $95,000. The finding of the trial court that there was no notice of breach and the apparent inference, stated above, that the matter was settled for $9,500 are challenged by Heublein in the appeal from the dismissal of its counterclaim.

In July 1977, Heublein began to implement its plans to build two more automated lines and had discussions with Stickle about designing improved fryers for the new lines. Because of Stickle's illness which became apparent about this time, Heublein was prepared "to do all the design work itself and reserve only the fabrication of the fryers to La Hacienda, [or] if La Hacienda preferred, to have a third party vendor supply the fryers, for which Heublein would pay a royalty to La Hacienda." During the spring and summer of 1977, William Dowd, Vice President of Heublein's Grocery Products Group, had several telephone discussions with Stickle concerning possible substitutes to the provisions of the October 5, 1976 agreement. According to Heublein, Stickle had become "disenchanted with the prospect of supplying additional 4-row fryers." Heublein contends that as a result of their discussions in August, "Dowd and Stickle reached an oral understanding to work toward an arrangement which would replace the existing Agreement with some sort of cross-licensing agreement." Such an agreement would have permitted La Hacienda to share in improvements developed by Heublein on the first fryer and, as explained in Dowd's memorandum of August 19, 1977, would grant Heublein "the privilege of using [Stickle's] patents to design and build fryers for our use." Moreover, Dowd testified that Stickle encouraged Heublein "to do whatever was necessary to keep the project on track." The oral "understanding" with Stickle was never made specific in terms; however, Heublein asserts that the absence of specifics does not negate the grant of a license. Because of Stickle's rapidly deteriorating health, no further negotiations with Stickle took place.

Gilbert Martinez (Martinez), Stickle's brother-in-law, became president of La Hacienda at the end of August 1977. By mid-September, Heublein was aware that Martinez was in charge. According to a memorandum of Dowd, dated September 14, 1977, a meeting was being arranged between Dowd and Martinez "to begin discussing the licensing arrangement." After Stickle's death at the end of September, Martinez wrote Dowd stating that it was his understanding that talks between Heublein and Stickle "had been general and no basis for a contract had been reached."

Heublein had not only been talking with La Hacienda about making the new fryers, but also was considering fabrication of the fryers by Heat and Control, Inc. (HCI). Heublein's witnesses testified that shortly after Stickle's death Heublein accepted a proposal from HCI to build the entire line except for the fryers. As shown by the

minutes of a meeting between Heublein and its consultants held one week after Stickle's death, even at that time, Heublein was considering having HCI, rather than La Hacienda, supply the fryers.

Martinez and Dowd met in November 1977 and discussed possible licensing arrangements, but the parties were unable to agree on the terms at this meeting or in subsequent discussions. On February 1, 1978, Heublein proceeded to order the fryers from HCI. However, HCI was unwilling to accept the order without assurances from Heublein that it would indemnify HCI for infringement of the '273 and '638 patents. Heublein admits that Heublein gave such assurances and authorized HCI to build the fryers in May 1978, although HCI did not formally accept the purchase order until August 18, 1978. HCI delivered the fryers in September. When these fryers proved to be far superior to the fryer in line one obtained from La Hacienda, Heublein replaced the line one fryer in 1980 with a third fryer built by HCI.

To justify obtaining fryers from HCI, Heublein asserts that by May 1978 it was clear that La Hacienda was either unwilling or incapable of building additional 4-row fryers and, thus, would breach the October 5, 1976 contract to provide additional HUB–2000's. Heublein asserts that the purchase of fryers from HCI should be viewed as an act to mitigate damages arising from La Hacienda's anticipatory breach.

Rejecting Heublein's position, the district court found that the "two new lines . . . were not to include . . . HUB–2000 fryer[s] but were to include improved fryers . . . incorporat[ing] successful innovations proven on the first line or which had been indicated as desirable as a result of experience with the first line."

After Heublein received and installed the HCI fryers, negotiations continued between Heublein and Martinez for a license under the Stickle patents. In a March 13, 1979 letter, Martinez stated that Stickle had been willing to license the making of "three 4-row taco shell fryers for a royalty of

$90,000 per machine." Martinez specifically proposed a license fee of $55,000 per machine for two fryers, plus a royalty free license to La Hacienda of certain Heublein "technology," and releases from any existing agreements with Heublein. Heublein found the proposed fee excessive, but the record before us does not disclose the particulars of Heublein's counter-proposal.

## II

### The District Court Decision

In the complaint filed in May 1979 charging patent infringement, H.M. Stickle, the widow of Dan Stickle, Martinez, I.M. Garcia, J.M. Davis, and G.M. Goldstein alleged that they were the holders of legal title to Stickle's patents, an undivided one-half interest by Mrs. Stickle in her own capacity, and an undivided one-half interest by Martinez, Garcia, Davis and Goldstein as co-trustees (co-trustees). La Hacienda asserted rights as the exclusive licensee under the '273 patent. Heublein answered denying that its fryers fell within the claims and denying validity of all claims asserted. Heublein further asserted as affirmative defenses that it had a valid license and/or that it had been induced to infringe with Stickle's full knowledge and approval and that the plaintiffs were therefore estopped to accuse Heublein of infringement. Heublein also counterclaimed for damages resulting from (1) breach of warranty for the faulty HUB–2000 and (2) anticipatory breach by La Hacienda with respect to its obligation to provide additional HUB–2000's. Heublein continued to assert all defenses until July 1981 (about one month prior to the liability trial), at which time it conceded that the claims were valid and that the HCI fryers were covered by the asserted claims.

The district court dismissed Heublein's breach of warranty counterclaim on the ground that Heublein failed to prove that it gave notice of the alleged breach to La Hacienda[3] and was therefore barred under

---

**3.** The district court also found that Heublein

had not given La Hacienda an opportunity to

Tex.Bus. & Com.Code Ann. § 2.607(c)(1) (Tex. UCC) (Vernon 1968) (hereinafter UCC § 2–607)[4] from asserting the claim. The district court also dismissed Heublein's anticipatory breach counterclaim stating that Heublein had not established "a distinct and unequivocal refusal to perform ... i.e., to supply additional Model # HUB–2000 fryers ...." The district court explicitly declined to reach the issue whether the written agreement to provide more HUB–2000's was binding and enforceable. The court rejected Heublein's contention that either the agreement to supply additional HUB–2000's or Stickle's actions gave Heublein a license, express or implied, under the patents in suit.[5]

At the trial for an accounting, the district court concluded that a reasonable royalty was to be based upon "the amount a willing licensor and willing licensee would have agreed upon during hypothetical negotiations at the time infringement first began." The district court concluded that "the utility of the inventions was not adequately reflected in the amount of hardware required to implement them" and, thus, rejected Heublein's theory that such negotiations would have resulted in a lump-sum paid-up royalty per fryer for a license to make and use. Rather, the court found that both parties to hypothetical negotiations would have recognized that the licensor should share in "the benefit the licensee expected to derive from using the inventions." On the basis of Heublein's cost savings compared to using J.C. Ford fryers, the court calculated a reasonable royalty to be 4.2% of Heublein's selling price of all tacos produced by the infringing fryers, approximately $1.5 million. Damages were not increased despite the finding (in connection with the interest and attorney fees) that Heublein's infringement was deliberate and willful.

Holding this to be an exceptional case, the district court awarded attorney fees under 35 U.S.C. § 285 and prejudgment interest.

## III

### Ownership of Patents

Throughout the controversy, Heublein has maintained that the law suit should have been dismissed for plaintiffs' failure to establish a *prima facie* case that the named parties own the entire right, title, and interest in and to the patents in suit. The district court repeatedly rebuffed Heublein and concluded that the patents were part of Stickle's estate and that under Texas law, title passed upon his death in accordance with his will. The district court held that Mrs. Stickle correctly asserted ownership of an undivided one-half interest either by virtue of Texas community property law and/or by Stickle's will. It held further that the co-trustees owned legal title to the other undivided one-half interest by virtue of Stickle's will. Thus, the court concluded that an indispensable party was not missing.

At the time of Stickle's death, Texas law provided that "[w]hen a person dies, leaving a lawful will, all of his estate ... bequeathed by such will ... *shall vest immediately* in the ... legatees of such estate ...." V.A.T.S. Probate Code, § 37 (emphasis added). In the absence of a showing

---

correct the defects. As conceded by the parties, La Hacienda did not wish to undertake this task and permitted Heublein to effect repairs.

4. The parties stipulated that the Uniform Commercial Code, as adopted in Texas, controls. *See* Tex.Bus. & Com.Code Ann. § 1.101 *et seq.* (Tex. UCC) (Vernon 1968 & Supp.1978). The UCC sections relevant to this case have been adopted verbatim in Texas and we will, therefore, refer to the UCC sections for simplicity.

5. Heublein does not assert freedom from liability, but only that its liability was limited to the royalties Stickle could have sought under the license, offset by Heublein's asserted contract damages. Here, the former was asserted to be limited to a portion of the $79,500 purchase price per machine as contemplated by the parties' original agreement. Heublein's principal contention is that, by virtue of its license, the district court erred in enjoining its use of the fryers obtained from HCI. *See De Forest Radio Telephone Co. v. United States,* 273 U.S. 236, 47 S.Ct. 366, 71 L.Ed. 625 (1927).

by Heublein that Stickle had parted with ownership prior to his death, Stickle is presumed to have been the owner. *See Keller v. Sprout, Waldron & Co.,* 129 USPQ 465, 466–67 (S.D.N.Y.1961). The district court held that no such showing was made and that title to the patents was in Stickle's estate at the time of his death and, thus, passed according to his will as provided by law. No error has been shown in the court's findings or conclusion on this issue and we affirm.

## IV

### *Heublein's License Defense*

The district court held that Heublein did not prove the grant of a license by Stickle, express or implied, and that the appellees, as successors to Stickle's interest, were not estopped from asserting infringement.

### A

Heublein first contends, as a basis for an implied license, that La Hacienda repudiated the October 5, 1976 agreement to supply additional HUB–2000's, thereby giving Heublein the right to "cover" the contract through use of a third party. Since Heublein could most effectively mitigate damages only by purchasing Stickle fryers from someone else, Heublein argues that a license under the patents should be implied.

While the record does not indicate any eagerness by Stickle or Martinez to build any more large fryers, the district court's conclusion that the facts did not establish a distinct and unequivocal refusal by La Hacienda to perform is correct. Whether La Hacienda could or could not have made such machines meet the specifications is not the issue. The fact is that at no time did Heublein order, or even attempt to obtain, additional HUB–2000's from La Hacienda. Moreover, Heublein's offer *to design* the fryers needed for the additional lines and to have La Hacienda build them from these designs, supports the inference that Heublein was not merely seeking HUB–2000's which operated up to a particular capacity but rather, as the district court found, Heu-

blein was seeking to purchase machines other than HUB–2000's.

To overcome the effect of this finding Heublein would have us read the October 5, 1976 agreement broadly as "a requirements contract whereby La Hacienda would supply new high-speed fryers for Heublein's Stoughton facility," in effect a contract "securing the patent benefits." Assuming the validity of the 1976 agreement, we do not agree with this interpretation. At most La Hacienda would have been obligated to supply additional HUB–2000's at a price of $79,500. That Heublein had developed a substantially improved design *did* not change the nature of La Hacienda's obligations. There was no general requirement to supply "high-speed fryers," no obligation on La Hacienda to design or build new machines, and no provision for a price adjustment to cover any changes in design. Thus, Heublein's assertion that it was reasonable to anticipate a breach of the contract because, without Stickle, it was "impossible for La Hacienda to design and build additional fryers" must fail. La Hacienda was simply not obligated to design and build new fryers.

The fact that Heublein was seeking different machines makes this case distinguishable from *Bonebrake v. Cox,* 499 F.2d 951 (8th Cir.1974), cited by Heublein, where the complainant, through a third party, obtained performance of a specific contract after the death of the vendor. Similarly, La Hacienda's offer to license the manufacture of non–HUB–2000's cannot be held to be a repudiation of a contract to provide HUB–2000's. The proposed license was not an offer to perform a contract only if its terms were changed, as in *Lumbermen's Mutual Casualty Co. v. Klotz,* 251 F.2d 499 (5th Cir.1958), also cited by Heublein. Heublein, not La Hacienda, sought to change the terms.

In sum, there can be no breach of an agreement to provide certain goods where the goods sought by the vendee are different from those covered by the agreement. Accordingly, no anticipatory breach

having occurred,[6] Heublein had no right to "cover" the contract and, thus, no implied license on this theory.

B

Heublein argues, alternatively, that the "entire course of conduct" between the parties, especially Stickle's encouragement to do "whatever is necessary to keep the project on track," amounts to an implied license, citing *De Forest Radio Telephone Co. v. United States,* 273 U.S. 236, 47 S.Ct. 366, 71 L.Ed. 625 (1927).

■ As the Supreme Court recognized, "[a]ny language used by the *owner* of the patent, or any conduct on his part exhibited to another from which that other may *properly infer that the owner consents* to his use of the patent [*i.e.,* patented invention] . . . constitutes a license . . . ." *Id.* at 241, 47 S.Ct. at 367 (emphasis added). The *De Forest* case and the relatively few instances where implied licenses have been found rely on the doctrine of equitable estoppel, the basis upon which Heublein claims an implied license. *See, e.g., St. Joseph Iron Works v. Farmers Manufacturing Co.,* 106 F.2d 294, 42 USPQ 558 (4th Cir.1939).

■ One common thread in cases in which equitable estoppel applies is that the actor committed himself to act, and indeed acted, as a direct consequence of another's conduct. *See Dickerson v. Colgrove,* 100 U.S. 578, 580, 25 L.Ed. 618 (1879). Thus, an implied license cannot arise out of the unilateral expectations or even reasonable hopes of one party. One must have been led to take action by the conduct of the other party.

To bring itself within this doctrine, Heublein focuses on Stickle's conduct. However; Heublein did not commit any infringing acts or become "committed" to a course of infringing action, as we would interpret that term, until after Stickle's death. The new fryers which were to incorporate Stickle's patented inventions were only in the design stage in August 1977 when Stickle told Heublein to "keep the project on track," whatever that may have meant. Thus, the conduct of Martinez must be considered in determining whether Heublein could *properly* infer that it had consent from the *owner(s)* to make or use infringing fryers.

The negotiations with Martinez do not have the character of merely working out "details" of a recognized commitment to license. Even prior to Stickle's death, Martinez made clear that it was his obligation "to protect [Stickle's patent] rights from any infringement." His letter to Heublein two weeks later stated: "My understanding is that all talks [with Stickle] had been general and no basis for a contract had been reached." That Martinez continued to negotiate does not give rise to an estoppel. Nothing in Martinez' words or acts can reasonably be said to have led Heublein to expect that it could proceed without an express written license explicit in terms. Heublein's acts of going forward to the point where it became committed to utilizing Stickle's patented inventions in its new lines cannot in itself create estoppel.

Thus, we conclude that the trial court committed no error when it held that Heublein's defenses of estoppel and license were without merit.

V

*Breach of Warranty*

Heublein's counterclaim for breach of warranty against La Hacienda for delivery of a defective HUB–2000 was dismissed on the basis of a conclusion of law that Heublein failed to give La Hacienda notice of any alleged breach as required under the UCC.

■ UCC § 2–607 provides in pertinent part:

(b) Acceptance of goods by the buyer precludes rejection of the goods accepted and if made with knowledge of non-conformity cannot be revoked because of it unless the acceptance was on the reasonable assumption that the non-conformity

6. The dismissal of Heublein's counterclaim for anticipatory breach is, accordingly, affirmed.

would be seasonably cured but acceptance does not of itself impair any other remedy provided by this chapter for non-conformity.

> (c) Where a tender has been accepted (1) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy;

The law is well settled in most jurisdictions, including Texas, that the notice required by UCC § 2–607 must be sufficient to inform the "seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation." UCC § 2–607 comment 4 (adopted in Texas). *See also* Note, *Consumer Claims for Personal Injuries Under Texas UCC Implied Warranties—Defenses*, 16 Hous.L.Rev. 165, 187–88 (1978).

■ The district court's findings that La Hacienda was informed of problems and that certain understandings were reached with respect to modifying the fryer impels the conclusion that the intent of the Code's notice provision was satisfied. Hence, the conclusion that notice was not given is erroneous and must be reversed. On remand, appellees are not precluded from raising any other defense, including settlement, to the claim of breach of warranty.

## VI

### Damages

■ 35 U.S.C. § 284 provides, in pertinent part:

> Upon finding for the claimant the court shall award damages adequate to compensate for the infringement but in no event less than a reasonable royalty for

the use made of the invention by the infringer.

In *Aro Manufacturing Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 507, 84 S.Ct. 1526, 1543, 12 L.Ed.2d 457 (1964) (*Aro II*), the instruction by a plurality of the court, and generally followed in the circuits, is that under § 284 only "damages" may be recovered by a patent holder, not an infringer's "profits," as such. Further, "damages" are "compensation for the pecuniary loss he [the patent holder] suffered from the infringement, without regard to the question whether the defendant gained or lost by his unlawful acts." *Coupe v. Royer*, 155 U.S. 565, 582, 15 S.Ct. 199, 206, 39 L.Ed. 263 (1894).

■ More recently, in *General Motors Corp. v. Devex Corp.*, —— U.S. ——, 103 S.Ct. 2058, 76 L.Ed.2d 211 (1983), the Court again focused on the damage to the patentee in awarding interest from the time royalties should have been paid by the infringer. Thus, in determining the amount of an award, the objective should be kept in mind to place the patent owner at least "in as good a position as he would have been in had the infringer entered into a reasonable royalty agreement." 103 S.Ct. at 2062.[7]

Focusing on appellees' financial condition before and after the infringement, Heublein contends that the award must be no greater than the profit La Hacienda would have made on three fryers. Heublein then argues that, if a "reasonable royalty" is used as the basis for the award, a reasonable royalty would be less than these profits. In any event, Heublein asserts the award for three fryers clearly should be less than the sum of the agreed purchase price of $79,500 for each additional HUB–2000.

■ Contrary to Heublein's argument, damages to the patent holder cannot

---

7. Counterbalancing this consideration is that one who legitimately challenges the validity of a patent should not be overly penalized. Thus, a tension arises between these competing interests.

> As commentators have advised:
> On the one hand, the patent system requires a sufficiently severe penalty for infringement to protect the patent owner's exclusive posi-

tion from pirates, but on the other hand, the public interest requires that there be a real opportunity to test the grants made by the Patent Office, without fear of a ruinous penalty for asserting a position taken in good faith.

R.A. White & L.F. Lynch, *Winning the Last Battle—The Recovery of Actual Damages in Patent Infringement*, Pat.L.Ann. 35, 36 (1970).

simply be calculated in all cases by determining "the difference between his pecuniary condition after the infringement, and what his condition would have been if the infringement had not occurred," *Yale Lock Manufacturing Co. v. Sargent,* 117 U.S. 536, 552, 6 S.Ct. 934, 942, 29 L.Ed. 954 (1885). In the absence of exploitation by the patent holder, no damages would be awardable. This result would be contrary to the express statutory provision that the patent holder shall be awarded "no less than a reasonable royalty for the use made of the invention by the infringer." Thus, as held by this court in *Bandag, Inc. v. Gerrard Tire Co.,* 704 F.2d 1578, 1583, 217 USPQ 977, 981 (1983): "A reasonable royalty ... is ... the floor below which damages shall not fall."

In this case the possibility of appellees proving lost profits is, as appellees argue, highly speculative. Appellees suffered no loss in the sense of lost profits from Heublein's use of the infringing fryers. La Hacienda, the sole licensee, is in the business of selling fryers, not tacos. Thus, any loss in profits could only be as a result of HCI's building and selling infringing fryers to Heublein.

Even with respect to fryers, lost profits are speculative. La Hacienda did not make 4-row high-speed fryers as part of its regular production. Apart from the fabrication of the one HUB–2000, a clearly unsatisfactory undertaking even if settled at $9,000, Stickle had not attempted to exploit his inventions in the type of machine Heublein needed. Thus, this case does not lend itself to a determination of damages simply based on sales made by a competitor which, but for the infringement, would have been made by the patent holder. Moreover, since Stickle had never actually granted anyone (other than La Hacienda) a license under any of his patents, there is no established royalty rate. Manifestly, damages must be determined upon the basis of hypothetical licensing negotiations, as the district court proceeded to do. Moreover, damages may be sought on this basis in any event since it is the minimum to which the patent owner is entitled.

While the district court correctly noted that "it must inquire into those factors that will enable it to determine the amount a willing licensor and willing licensee would have agreed upon during hypothetical negotiations," citing *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,* 575 F.2d 1152, 1158, 197 USPQ 726, 732 (6th Cir.1978), notably absent from its findings is any consideration of the actual negotiations between the parties and of the evidence introduced by Heublein which negate that a continuing royalty based on the number of units produced by a machine (hereinafter "use royalty") would flow from such hypothetical negotiations.

Heublein's qualified experts unequivocally testified that the food processing industry did not, to their knowledge, utilize use royalties in connection with machines for producing food. The paucity of evidence put forth by La Hacienda does not in fact contradict Heublein's experts. La Hacienda's witnesses were able to provide no more than a few questionable incidents of use royalties in the entire industry, and none in connection with the sale of Stickle fryers, either under his mechanical or process patents. Moreover, the price at which Stickle, through La Hacienda, had sold fryers to Zapata and to Heublein did not vary with the quantum of use and never included a separate fee for the process. Finally, Stickle (per appellees), and later Martinez, in actual negotiations with Heublein, never offered anything other than a paid-up license for making and using the patented inventions.[8] It appears unquestionable that appellees would have been willing to license on this basis. Had such negotiations been with a third party, appellees' offers would have been relevant to a determina-

---

**8.** Since the parties treated the mechanical and process patents as a unitary licensing property, we need not consider damages for infringement of each patent individually. Under other circumstances it may well be necessary to determine damages separately for each such patent since a patent owner has every right to demand royalties for each patent he holds.

tion of a reasonable royalty. That the negotiations were with Heublein does not make them less relevant. *Trio Process Corp. v. L. Goldstein's Sons,* 612 F.2d 1353, 1359 (3d Cir.1980).

■■■■ In any event, the amount of the royalty should be that amount which adequately compensates for the infringement. *Georgia-Pacific Corp. v. United States Plywood Corp.,* 318 F.Supp. 1116, 1127 (S.D.N.Y.1970), *modified and aff'd sub nom., Georgia-Pacific Corp. v. United States Plywood-Champion Papers, Inc.,* 446 F.2d 295 (2d Cir.1971), *cert. denied,* 404 U.S. 870, 92 S.Ct. 105, 30 L.Ed.2d 114 (1971). In appropriate circumstances a patent owner may be able to recover the patent owner's lost profits attributable to each of a series of infringers. In contrast, when damages must be based on a reasonable royalty, as here, *Aro II* instructs us that a reasonable royalty is not to be separately calculated against each successive infringer. Once full recovery is obtained from one infringer with respect to a particular infringing device, at most nominal additional damages may be awarded against another with respect to the same device. *Aro II,* 377 U.S. at 502, 84 S.Ct. at 1540.

■■■■ Thus, in a suit against a user, we cannot simply hypothesize what a reasonable user would pay apart from considerations of what royalty a maker would pay and what rights would flow to the user if the maker had a license. Simply stated in terms of this case, the quantum of Stickle's recovery for an infringing fryer does not depend on whether Heublein or HCI is the defendant. Rather, it depends on what royalty reasonably would have resulted from negotiations where a willing licensor was aware that HCI would make and Heublein would use the fryer.

Turning to the arguments of the parties, appellees rely on *Tights, Inc. v. Kayser-Roth Corp.,* 442 F.Supp. 159, 196 USPQ 750 (M.D.N.C.1977), to support their position that the district court correctly concluded that a royalty would be based on the labor savings resulting from use of the patented inventions (converted to a percent of sales price of tacos). We find the *Tights* case clearly distinguishable. The patent owner in *Tights* was solely in the business of licensing a patent for U-shaped seam pantyhose and had a number of licensees who paid on the basis of a percent of the sales price of each item produced. In fixing the royalty rate the court found that prior to infringement the parties had actually agreed to the royalty rate ultimately utilized by the court. Thus, the court followed established industry practice in that the quantum of use was the usual basis for a royalty and looked to the past dealings of the parties in deciding upon a reasonable rate. Moreover, the patent covered the end product, the pantyhose. Appellees here have no patent on tacos.

We find *Foster v. American Machine & Foundry Co.,* 492 F.2d 1317, 182 USPQ 1 (2d Cir.1974), on which Heublein relies, presents a more comparable situation. *Foster,* the holder of a patent covering an impeding device and its use (i.e., apparatus and method claims) used in welding equipment, sought to have royalties based on hypothetical negotiations with the user rather than with the maker of the infringing devices. Noting that support for Foster's theory "would have to be found in a history evidencing willingness by the mill operators [i.e., users] to pay a running, or throughput royalty, based on the production" and finding no evidence to support that conclusion, the court rejected the user as the hypothetical licensee.

■■■■ Had Stickle sued HCI, the maker, rather than Heublein, the user, the situation here would closely parallel *Foster.* Since there is no evidence that users in the food industry upon purchase of food processing equipment also expect to pay a use royalty (whether based on a separate method patent or on the right to control use of patented machines), a willing licensor could not have reasonably expected to secure a use royalty from either the maker or user. We find this conclusion confirmed, indeed inescapable, from the actual negotiations between the parties. Martinez at no time suggested a use royalty, despite knowledge

of Heublein's intended use, even after Heublein had the infringing fryers in operation. Accordingly, we conclude that the trial court was clearly in error in basing a royalty on Heublein's production rather than on a lump-sum for each machine.

Stickle attempts to foreclose basing a reasonable royalty on the theory of a paid-up license by raising the spectre of a compulsory license. A paid-up license, Stickle argues, will permit Heublein to continue using the infringing fryers indefinitely. We agree that the injunction must be modified to permit use of the existing machines, but that consequence stems from an implied in law license and not from a compulsory license fashioned by the court to a particular case. Upon receiving full compensation for the making and using of existing infringing fryers, appellees are not thereafter entitled to enjoin use of such fryers. As stated in A. Deller, *Deller's Walker on Patents,* § 398 (2d ed. 1965):

> An actual recovery of a full royalty for making, and selling to others to be used, operates as an implied license to any purchaser of the thing thus made and sold, to use it to the same extent that he could lawfully have done if the maker had been licensed to make and sell it. [Footnote omitted.]

Injunctions and damages must be tailored to the circumstances and be correlatively determined. *See Signode Corp. v. Weld-Loc Systems, Inc.,* 700 F.2d 1108, 1115, 218 USPQ 293, 298 (7th Cir.1983) (injunctive relief against users stated to be inappropriate after patent holder of apparatus and process patents is made whole by maker/infringer); *see also Foster v. American Machine & Foundry Co., supra,* 492 F.2d at 1324, 182 USPQ at 6.

The amount of the lump-sum royalty is appropriately left to be determined by the trial court. For its guidance, however, we expressly reject Heublein's premise that the royalty fee must be less than the price of an HUB–2000. Appellees were under no obligation to license another to produce a machine and may have had

legitimate reasons for desiring to keep another manufacturer from producing even the special model desired by Heublein. The stumbling block to freer negotiations between the parties appears to have arisen from the special circumstance of their previous dealings. Heublein found it unreasonable to pay as much for a license as for a machine. However, in determining a reasonable royalty in hypothetical negotiations, a willing "hypothetical" licensee would not have been a party to any prior transactions and, thus, would not have had the same psychological reluctance as Heublein.

As a final matter we would add that the trial court may award an amount of damages greater than a reasonable royalty so that the award is "adequate to compensate for the infringement." As stated in *Panduit Corp. v. Stahlin Bros. Fibre Works, supra,* 575 F.2d at 1158, 197 USPQ at 731:

> [T]he infringer would have nothing to lose, and everything to gain if he could count on paying only the normal, routine royalty non-infringers might have paid. As said by this court in another context, the infringer would be in a "heads-I-win, tails-you-lose" position.

Such an increase, which may be stated by the trial court either as a reasonable royalty *for an infringer* (as in *Panduit*) or as an increase in the reasonable royalty determined by the court, is left to its sound discretion.

## VII

Heublein has presented no grounds for reversing the district court's conclusion that prejudgment interest (set at various rates between 10% and 15% depending on the period of time concerned) should be awarded.

In *General Motors Corp. v. Devex Corp.,* 103 S.Ct. at 2063, the Court held that "prejudgment interest should be awarded ... absent some justification for withholding such an award." Heublein does not raise any basis for such a justification and argues instead that prejudgment interest may not be awarded because, in Heublein's view,

**1564**

this is not an exceptional case. However, the Supreme Court made clear that "there is no warrant for imposing such a limitation." *Id.* at 2061. Prejudgment interest is typically included as part of the patentee's recovery to insure compliance with the statutory mandate of 35 U.S.C. § 284 that damages be "adequate to compensate for the infringement." *Id.* at 2062–63.

## VIII

### *Attorney Fees*

■ The award of attorney fees in the amount of $296,872, the entire amount for legal services rendered in this action up to June 19, 1982, must be vacated without prejudice, however, to an award being made on remand with respect to the patent issues upon appropriate findings.

35 U.S.C. § 285 provides:

The court in exceptional cases may award reasonable attorney fees to the prevailing party.

In view of the remand for trial on Heublein's counterclaim on the charge of Stickle's breach of warranty, no award of attorney fees in connection with this counterclaim is appropriate inasmuch as Stickle is not at this time a "prevailing party."

■ More importantly, however, an award of attorney fees for the breach of warranty claim is not authorized under § 285. *See Monolith Portland Midwest Co. v. Kaiser Aluminum & Chem. Corp.,* 407 F.2d 288, 299, 160 USPQ 577, 583 (9th Cir. 1969). Where an action combines both patent and nonpatent claims, the nonpatent issues may in some instances be so intertwined with the patent issues that the evidence would, in large part, be material to both types of issues. Heublein's counterclaim for damages for anticipatory breach, which was also asserted as giving rise to an implied license to obtain infringing machines, is of such nature. However, its claim for breach of the warranty on noninfringing goods delivered by La Hacienda is a wholly separate and separable claim from the patent issues. Stickle argues that Heublein never would have brought any coun-

terclaim but for this litigation. Assuming this is true, however, does not convert the independent warranty claim into a patent claim. The warranty claim was not, and by its nature could not be, a "mixed" claim, that is, one asserted as a shield as well as a sword.

■ Heublein principally attacks the award of attorney fees on the grounds that the trial court erroneously held this to be an "exceptional" case within the meaning of § 285. With respect to this issue, the court made the following findings:

71. Being on notice as to Stickle's patent rights but unable to obtain permission for use of the Stickle inventions, defendant knowingly and willfully infringed those rights and obtained and used the additional infringing fryers. Such deliberate conduct on defendant's part in blatant disregard for the patent rights of others makes this an exceptional case.

72. In addition to deliberately and willfully infringing the patents in suit, defendant also engaged in extraordinary misconduct by asserting numerous defenses in bad faith in this litigation. As a result, plaintiffs were required to expend time, money, and effort to prepare factual and legal presentations to overcome defendant's unsupported and apparently unsupportable defenses which were finally withdrawn.

The court went on to support the latter finding with additional findings that Heublein continued to maintain the defenses of invalidity and noninfringement (in the sense that its fryers did not fall within the claims) until shortly before trial and, in so doing, was guilty of bad faith. No other "bad faith" defenses were specified.

We cannot agree that the record shows numerous defenses put forth in bad faith. A reading of Heublein's answer does disclose the entire litany of defenses commonly asserted in patent cases. While we do not give our approval to a boilerplate answer, we believe something more in the way of vexatious tactics is necessary to establish that defenses are asserted in bad faith.

Moreover, we do not see that Heublein's elimination of issues before trial was any more significant than Stickle's assertion of patent claims which were withdrawn unless Heublein in fact had used sham defenses for vexatious or dilatory tactics.

With respect to the finding of appellees' need "to spend time, money and effort," it cannot readily be determined whether substantial expense was attributable to the defenses of invalidity and noninfringing devices. However, since Stickle points only to Heublein's vacuous answers to a dozen interrogatories directed to both defenses, it does not appear that the expense in connection with these assertions constituted a substantial part of the $296,000-plus fee. Moreover, the litigation proceeded from filing of the amended complaint to trial within little over a year, and no charge is made that Heublein used any defense to engage in dilatory tactics.

■ With respect to the court's finding of deliberate and willful infringement, more is necessary to support a finding of "willfulness" than that the infringing acts were not inadvertent. The court must determine that the infringer acted in disregard of the patent, that is, that the infringer had no reasonable basis for believing it had a right to do the acts. Even though the court here found that Heublein had no reasonable basis to believe it had a license arising from the words and acts of Stickle and Martinez, the court failed to address whether Heublein might reasonably have believed it had rights flowing from anticipatory breach of the October 6, 1976 agreement.

■ Accordingly, since the award of attorney fees under 35 U.S.C. § 285 is excessive in that it covered nonpatent issues and otherwise rested on clearly erroneous and/or insufficient findings, the award is vacated without prejudice.[9]

### Conclusion

The judgment of the district court is *affirmed-in-part, reversed-in-part,* and the case is *remanded* for further proceedings and for entry of a new judgment consistent herewith. No costs.

AFFIRMED–IN–PART, REVERSED–IN–PART, AND REMANDED.

---

**9.** For a comprehensive discussion of attorney fees, *see* A. Ahart, *Attorneys' Fees: The Patent Experience,* 57 J.Pat.Off. Soc'y 608 (1975); 5 D. Chisum, Patents § 20–3[4][C] (1982).