**TRANS–WORLD MANUFACTURING CORP., Plaintiff,**

**v.**

**AL NYMAN & SONS, INC. and Al-Site Corporation, Defendants.**

**Civ. A. No. 81–471 CMW.**

United States District Court, D. Delaware.

April 9, 1986.

As Amended April 15, 1986.

Harold Pezzner of Connolly, Bove, Lodge & Hutz, Wilmington, Del., for plaintiff; William L. Mentlik and Roy H. Wepner of Lerner, David, Littenberg, Krumholz & Mentlik, Westfield, N.J., of counsel.

Steven J. Rothschild, Edward P. Welch and Andrew J. Turezyn of Skadden, Arps, Slate, Meagher & Flom, Wilmington, Del., for defendants; Peter T. Cobrin of Stempler, Cobrin & Godsberg, New York City, of counsel.

## OPINION

CALEB M. WRIGHT, Senior District Judge.

This patent case is before the Court for a determination of the damages owed to plaintiff because of defendants' infringing activity.

The plaintiff, Trans-World Manufacturing Corp. ("Trans-World"), is incorporated in New Jersey and manufactures point-of-purchase displays. Defendant Al Nyman & Sons, Inc. is a Delaware corporation. Defendant Al-Site Corporation is a wholly-owned subsidiary of defendant Al Nyman

& Sons, Inc., and is also incorporated in Delaware. The defendants will hereinafter be referred to collectively as "Nyman".

Nyman is in the business of selling non-prescription, over-the-counter reading glasses. The glasses usually are sold in drug stores and discount stores under the trademark Magnivision. Nyman's customers sell the eyeglasses they purchase from Nyman in display cases (point-of-purchase advertising displays) which Nyman furnishes and which remain the property of Nyman.

This action is for infringement of U.S. Design Patent No. DES 258,099 ("the '099 Patent"). A jury trial directed to both liability and damages was held during May 16–24, 1983. The jury held the '009 Patent invalid. It thus did not reach the damages issue.

This Court entered judgment notwithstanding the verdict and held that the '099 Patent was valid and infringed by Nyman. The Court directed that a new trial be held on the issue of damages. *Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 219 U.S.P.Q. 1059 (D.Del.1983), *affirmed in part and remanded in part on other grounds*, 750 F.2d 1552 (Fed.Cir.1984).

On December 12, 1983, the Court entered a Final Judgment Except For Accounting, holding that the '099 Patent was valid, owned by Trans-World, and infringed by Nyman. The Court also directed that the accounting with respect to damages be stayed pending appeal to the U.S. Court of Appeals for the Federal Circuit.

On December 20, 1984, the Federal Circuit affirmed the judgment of this Court that the '099 Patent was valid and infringed, and that Trans-World was entitled to a new trial on the issue of damages. 750 F.2d at 1562–64. However, the Court of Appeals disagreed with this Court's exclusion of evidence relating to Nyman's sales of eyeglasses displayed within the infringing display cases. It found this evidence relevant to the determination of a reasonable royalty, but expressed no view as to the weight, if any, to be attributed to the evidence. *Id.* at 1568.

On remand, the parties waived trial by jury on the issue of damages. This Court was to base its decision on the record developed at the previous trial, supplemented by Nyman's responses to two additional interrogatories from plaintiff. *See* Docket No. 148. The Court found it necessary, however, to write to counsel on two occasions, *see* Letters from Court to Counsel (Aug. 9, 1985; Nov. 20, 1985), in hopes of mending the threadbare information on damages found in the existing record and avoiding a damages award cut out of whole cloth.

Although the Court previously has set forth the background of this dispute, *see* 219 U.S.P.Q. at 1062–63, an extensive recitation of facts is necessary to provide an understanding of the dilemma faced by this Court in calculating damages.

## I. FACTUAL BACKGROUND

In late 1977 and early 1978, Arthur M. Marx, an advertising executive representing Nyman, contacted James Cavaluzzi, President of Trans-World, and advised him that Nyman was interested in obtaining new and updated displays for its eyeglasses. The two met to discuss Nyman's requirements. Trans-World subsequently agreed to create, at its own expense, a series of sketches of new eyeglass display designs for Nyman. Trans-World is not in the business of licensing its designs and does not contract for the sale of design services. Instead, the company recoups the cost of designing displays through the price charged for their manufacture. (T.R. A–59).[1]

Trans-World presented the first set of sketches to Marx and Morton Nyman, the owner of Al Nyman & Sons, Inc., in June of 1978. Marx and Nyman rejected these proposed designs. Trans-World then proceeded to develop new designs in a second series of sketches. After further communication, Trans-World developed two de-

---

1. Citations to the record of the original trial will be designated as "T.R. ___". Citations to exhib-its admitted at the trial will be designated as "PX ___" or "DX ___".

signs for displays acceptable to Nyman. The first design, for a horizontal display, does not concern the Court here. The second design, for a "vertical chevron" display, was embodied ultimately in the '099 Patent.

Nyman approved Trans-World's design of a 72-piece upright floor chevron design and an upright chevron design counter display. In a letter dated October 6, 1978, Nyman directed Trans-World to prepare models of both the horizontal and chevron designs. Trans-World prepared these models and sent Nyman an invoice for $4,300 to cover its costs on December 19, 1978. The invoice expressly stated that "Trans-World Mfg. retains all rights and exclusive title to the above designs. It [sic] may not be reproduced without our written permission." Pretrial Order 7, at ¶ 13, Docket No. 87.

On December 20, 1978, and again on January 19, 1979, Nyman requested that James Cavaluzzi, Trans-World's President, provide Nyman with prices for quantities of 1000, 2000 and 3000 units of certain displays, including vertical (chevron), and counter floor (chevron) displays (T.R. A–87, A–82–83; PX–20; PX–23). The chevron displays in question embodied the patent design of the '099 Patent.

Nyman informed Cavaluzzi, at some point, that its budget for the displays anticipated an expenditure of approximately 50 cents per pair of glasses held by the display, so that the company expected to spend about $36 for a display holding 72 pairs of glasses. (T.R. B–193, C–67). Nyman officials testified at trial that they were willing to pay Trans-World a premium of ten percent to fifteen percent above the competitive price to manufacture the displays because Trans-World had been involved in their design. (T.R. C–77, D–31).

Cavaluzzi asked Robert McKay, Trans-World's production manager, to provide cost estimates for the displays. McKay had worked for nine years as production manager for a point-of-purchase display manufacturer prior to his employment by Trans-World. (T.R. B–120). He joined Trans-World in 1978. McKay was in charge of establishing all estimates for displays produced by Trans-World. He had worked on more than fifty display projects and was familiar with the manner in which cost estimates should be prepared. (T.R. B–124–25).

McKay prepared detailed estimate sheets for the vertical counter unit (PX–37), and a similar estimate sheet for the floor stand version (PX–38). As requested, McKay prepared cost estimates for quantities of 1000, 2000 and 3000 units. (T.R. B–142). He obtained information on costs from suppliers of materials that Trans-World could not manufacture itself, and developed internal costs for material and labor. (T.R. B–129–30). For 1000 units, he arrived at an estimated cost of $45.57 per unit, to which he added $2.50 for spoilage, arriving at a total cost per unit for quantities of 1000 units of $48.07. Using the same method, he estimated total unit costs of $43.70 for 2000 units, and $40.07 for 3000 units. See Plaintiff's Proposed Findings of Fact ¶ 17; PX–37.

For the floor stand vertical displays, McKay provided estimates for material and labor of $49.57 per unit of 1000 units plus spoilage of $3.50 for a total unit cost of $53.07 per unit. (PX–38). On a similar calculation for quantities of 2000 units, he estimated the cost to be $47.96 per unit, and for 3000 units, he estimated the total cost of $44.25 per unit. See Plaintiff's Proposed Findings of Fact ¶ 18; PX–38.

McKay added to the above prices the two mark-ups that Trans-World applied in all cases: a factory mark-up of 1.75, and a sales mark-up of 1.25. Richard Fellinger, vice-president of Trans-World, approved the McKay estimates. (T.R. B–135–36; T.R. B–224). Based on the cost data provided by McKay, Cavaluzzi submitted prices as follows:

VERTICAL COUNTER UNIT

| QUANTITY | PRICE |
| --- | --- |
| 1000 units | $102.00 per unit |
| 2000 units | 96.00 per unit |
| 3000 units | 90.00 per unit |

VERTICAL FLOOR STAND

| QUANTITY | PRICE |
|---|---|
| 1000 units | $110.00 per unit |
| 2000 units | 104.00 per unit |
| 3000 units | 98.00 per unit |

(PX–24). Based on the costs and unit prices quoted, Trans-World could have realized a profit per unit as follows:

VERTICAL COUNTER UNIT

| QUANTITY | PROFIT |
|---|---|
| 1000 units | $ 53.93 per unit |
| 2000 units | 52.30 per unit |
| 3000 units | 49.93 per unit |

VERTICAL FLOOR STAND

| QUANTITY | PROFIT |
|---|---|
| 1000 units | $ 56.93 per unit |
| 2000 units | 56.04 per unit |
| 3000 units | 53.75 per unit |

Nyman objected to the prices quoted by Trans-World as too high, and Cavaluzzi directed McKay to revise the estimate downward. (T.R. B–149). McKay achieved a cost savings of approximately seventeen percent, and Cavaluzzi provided Nyman with revised estimates reflecting a ten percent price reduction. *See* Plaintiff's Proposed Findings of Fact ¶¶ 24, 26; T.R. B–149, D–30. Applying the seventeen percent cost reduction and a ten percent price reduction to the figures set out above, Trans-World calculated revised profit figures as follows:

VERTICAL COUNTER UNIT

| QUANTITY | PROFIT |
|---|---|
| 1000 units | $51.39 per unit |
| 2000 units | 49.70 per unit |
| 3000 units | 47.40 per unit |

VERTICAL FLOOR STAND

| QUANTITY | PROFIT |
|---|---|
| 1000 units | $53.91 per unit |

2. In the pretrial order, both sides had listed as proposed exhibits collections of invoices purportedly showing how many infringing displays were shipped and when they were shipped. *See* Pretrial Order 92, at # 105, 106 (Plaintiff's Exhibits), 104, at # 106–10 (Defendants' Exhibits), Docket No. 87. Neither side offered these exhibits into evidence, although the Court received a copy of defendants' proposed exhibits. Plaintiff's Exhibit 105 was used at trial, *see* T.R. C–85, but the Court does not have a copy of it.

| | |
|---|---|
| 2000 units | 53.29 per unit |
| 3000 units | 51.00 per unit |

Plaintiff's Proposed Findings of Fact ¶ 28, Docket No. 151.

Nyman claimed that the revised prices were exorbitant, but Trans-World would not submit any lower figures. Nyman subsequently obtained displays infringing the '099 Patent from sources other than Trans-World. These displays cost substantially less than those offered by Trans-World. Nyman obtained one order of infringing displays for approximately $25 per unit and a second order for approximately $35 per unit. (T.R. C–80). No evidence was offered on how the manufacturers of the infringing displays calculated their prices and what profits they made.

The '099 Patent was issued to Trans-World on February 3, 1981. This lawsuit was filed on October 23, 1981.

Conflicting and incomplete evidence exists about the number of infringing units purchased by Nyman. At trial, the only evidence introduced on this question was a listing of the number of infringing displays shipped by Nyman to its customers as of May 1982. (PX–91).[2] This exhibit was represented as Nyman's "total sales" as of that date, and each display listed, except those described as "72 CTR", infringed the '099 Patent. According to this exhibit, there were 3,968 infringing displays manufactured as of May 1982.[3] An interrogatory answer filed by Nyman subsequent to the trial suggests that a lower number of infringing units may be involved, however. In response to Plaintiff's Interrogatory No. 25, which inquired about the number of infringing displays manufactured or purchased since the May 1983 trial

3. PX–91 lists the following types and number of infringing displays:

| Type | Number |
|---|---|
| 72 SPR | 3,312 |
| 72 FLR | 381 |
| 100 FLR | 100 |
| 144 DBL | 175 |

The three-letter abbreviation indicates the style of the display; the numeral preceding it indicates how many pairs of eyeglasses the display held.

date, Nyman stated that "[a] total of 3,010 chevron displays were shipped, of which 366 were shipped subsequent to May, 1983." Defendants' Response to Plaintiff's Fourth Set of Interrogatories (Nos. 25 and 26), ¶ 25, Docket No. 150. *See also* Letter from Peter T. Cobrin to Judge Caleb M. Wright (Nov. 29, 1985).

The record also contains sketchy information about the profits made by Nyman on eyeglasses sold in the infringing displays. Nyman purchased the eyeglasses for approximately $2.60 per pair and sold them for $4.86 per pair. Response to Plaintiff's Fourth Set of Interrogatories (Nos. 25 and 26), ¶ 26, Docket No. 150. Although requested, Nyman evidently did not provide information about the number of eyeglasses sold in conjunction with the infringing displays or as refills for them. *See id.* Nyman's customers sold the eyeglasses to individuals for approximately $12 per pair. (T.R. C–82).

## II. DISCUSSION

The applicable statute, 35 U.S.C. § 284, requires that the patent owner receive from the infringer "damages adequate to compensate for the infringement but in no event less than a reasonable royalty for the use made of the invention by the infringer." The statutory objective is to put the patent owner in "as good a position as he would have been in had the infringer entered into a reasonable royalty agreement." *General Motors Corp. v. Devex Corp.,* 461 U.S. 648, 655, 103 S.Ct. 2058, 2062, 76 L.Ed.2d 211 (1983).

 Compensatory damages may be calculated under a number of theories, including (1) lost profits; (2) an established royalty; or (3) a reasonable royalty. Lost profits, in the form of sales diversion, price erosion or increased expense, are an appropriate measure of damages when the patent owner exploits the lawful patent rights directly by manufacture, use or sale. Sometimes lost profits are calculated indirectly, by awarding damages based on the profits made by the infringer through his illicit use of the patent. When the patent owner offers licenses at an established royalty rate, this established rate is an appropriate way of determining the proper amount of damages. Where lost profits or an established royalty rate cannot be proven, the patent owner may recover from the infringer not less than a reasonable royalty: that is, the royalty to which a willing licensor and licensee would have agreed had they negotiated a license under the patent. *See* 5 D.Chisum, Patents § 20.03, at 20–71 (1985) (discussing methods of damages calculation).

The determination of a damages award is not an exact science. Although a damages award cannot be based on "mere speculation or guess, it will be enough if the evidence shows the extent of damages as a matter of just and reasonable inference, although the result be only approximate." *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931) (quoted in *Paper Converting Machine Co. v. Magna-Graphics Corp.,* 745 F.2d 11, 22 (Fed.Cir. 1984)).

The parties here have taken widely divergent positions on which damages theory is appropriate and what an adequate amount of damages would be. Trans-World conflates two of the theories and argues that a "reasonable royalty" consists of the profits it lost by not manufacturing the displays at issue. It relies on the price quotations for the displays set out in the preceding section and concludes that a "lost profit" figure of $50 per infringing unit is appropriate. Given its claim that 3,968 infringing units were manufactured, Trans-World arrives at a damages figure of $198,400. Plaintiff's Proposed Conclusions of Law, ¶¶ 18, 21, Docket No. 151. Trans-World also seeks prejudgment interest on this amount.

Nyman, on the other hand, argues that a reasonable royalty would be five percent of the approximately $30 purchase price it paid for each infringing unit, or $1.50 per unit. Defendants' Proposed Findings of Fact, ¶ 35, Docket No. 152. Given Nyman's contention that it obtained only 3,010 infringing units, the total royalty equals

$4,515. *See* Letter from Peter T. Cobrin to Judge Caleb M. Wright (Nov. 29, 1985).

The Court concludes that a damages award based on lost profits, as proposed by Trans-World, is too speculative and that any award must be based on the reasonable royalty theory. *Cf., Trans-World Mfg. Corp.*, 750 F.2d 1552, 1569. It is necessary first to review the legal base for the various theories of recovery before setting forth the Court's method for calculating a reasonable royalty in this unique situation.

### A. Lost Profits Method

Recovery of damages under the lost profits method requires the patent holder to prove two things: (1) causation—i.e., that the patent holder would have made the sale of the product "but for" the infringement; and (2) proper evidence of the computation on the loss of profits. *King Instrument Corp. v. Otari Corp.*, 767 F.2d 853, 863, 226 U.S.P.Q. 402, 409 (Fed.Cir. 1985), *cert. denied*, — U.S. —, 106 S.Ct. 1197, 89 L.Ed.2d 312 (1986); *Paper Converting Machine Corp. v. Magna-Graphics Corp.*, 745 F.2d 11, 21 (Fed.Cir.1984).[4] The patent holder can compute its lost profits directly, through its anticipated profit margin, or indirectly, through use of the infringer's profit margin. The patent holder must show only a reasonable probability that it would have made the sales but for the infringement; it need not negate all possibility that a purchaser might have bought a different product or foregone the purchase totally. *Paper Converting Machine Co.*, 745 F.2d at 21.

Trans-World has presented extensive evidence about the profits it would have made had it sold the displays to Nyman. However, it has failed to convince the Court that there was a reasonable probability that it would have made the sales *but for* Nyman's infringing activity. This conclusion stems from the unique bargaining position Nyman enjoyed compared to the average infringer.

Design Patent '099 was for one purpose and one purpose alone—to satisfy Nyman, the *only* customer for the displays. The design was satisfactory to Nyman, but the evidence leads this Court to conclude that Nyman could not afford to pay the price demanded by Trans-World and would not have bought the displays at that price.[5] Although Trans-World effectively may have had a monopoly on the chevron display because of its patent, Nyman had a similar monopsony power as the sole customer for the display. If no compromise price were reached, Nyman probably would have abandoned the project and Trans-World would have had no opportunity to make any sales. Without sales, Trans-World could lose no profits. To award the lost profit figure proposed by Trans-World thus would involve the Court in improper speculation.

Trans-World nonetheless contends that it should get the profit figure it requests, despite Nyman's bargaining power, for two reasons: (1) On February 3, 1981, the time when the '099 Patent issued and infringe-

---

**4.** The Federal Circuit has endorsed at least one other test for calculating lost profits. *See Central Soya Co. v. George A. Hormel & Co.*, 723 F.2d 1573, 1578–79 (Fed.Cir.1983) (approving use of four-part test set out in *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, 1156 (6th Cir.1978)). None of these tests is exclusive, and this Court would reach the same conclusion about Trans-World's "lost profits" under the *Panduit* test.

**5.** Nyman's representative Arthur M. Marx testified at the trial:

I detailed to [Trans-World officials] very carefully that my client, I doubted whether my client made $200,000 a year profit out of the whole business; how could he ever pay for two units some $200,000? You will wipe out any profit and put his company into a loss. T.R. D–30.

Nyman's owner, Morton Nyman, testified similarly:

Q. Would it have been economically feasible for you to go ahead with these units? Would it have been feasible at all?

A. No. we just couldn't have entertained anything at this price, and had the competitive bids come in at the same price, we would have just dropped the project and tried to make another model, another item. T.R. C–76.

ment began, Nyman already had shipped some infringing displays to its customers and would have paid Trans-World's price to avoid embarrassment; and (2) Trans-World's policy of never licensing its designs meant that it had no incentive to settle for a lesser price (and a lesser profit). *See* Plaintiff's Proposed Findings of Fact, ¶¶ 59, 60, Docket No. 151; Letter from William L. Mentlik to Judge Caleb M. Wright 4–5 (Mar. 22, 1985). The Court finds neither of these contentions persuasive.

▇ The "embarrassment" argument fails for lack of evidence. First, there is no evidence before the Court concerning shipment dates for the displays,[6] so that the Court cannot decide whether Nyman had supplied its customers with displays prior to February 3, 1981, and thus had a reason for embarrassment. Moreover, there is no evidence showing that Nyman would have been embarrassed to recall the displays at that time.[7]

▇ Some case law supports Trans-World's argument that it had no incentive to accept a lower price because it never licensed its designs. *See, e.g., Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, 1163 (6th Cir.1978); *Arriflex Corp. v. Aaton Cameras, Inc.*, 29 Patent Trademark & Copright J. (BNA) 396 (S.D. N.Y. Oct. 29, 1984). These cases are distinguishable from the instant situation, because they involved a patent holder and infringer competing to supply an existing market. In contrast, Nyman and Trans-World were not competitors, and no customer for the patented product existed other than Nyman.

The Court's decision to reject Trans-World's calculation of its "lost profits" as a measure of damages is reinforced by the Federal Circuit ruling in *Stickle v. Heublein, Inc.*, 716 F.2d 1550 (Fed.Cir.1983), which involved an analogous method of infringement. In *Stickle*, defendant Heublein, Inc., contracted with plaintiff to design and manufacture a new taco shell production line, which included a new high-speed fryer embodying several patents owned by plaintiff. Heublein purchased one of the new fryers but abandoned plans to purchase additional fryers from plaintiff after it experienced mechanical problems with the first. Heublein instead contracted with another company, HCI, to supply fryers utilizing the patents. License negotiations between the parties produced no agreement because Heublein found plaintiff's demands excessive.

Discussing what damages plaintiff could recover for this infringement, the Federal Circuit gave two reasons for rejecting the lost profits theory as too speculative. First, the Court found that plaintiff suffered "no loss in the sense of lost profits" from Heublein's *use* of the infringing fryers, because any lost profits resulted only from HCI's *sale* of fryers to Heublein. 716 F.2d at 1561 (emphasis added). Second, plaintiff had not attempted to exploit its patent in a manner useful to Heublein, apparently the only customer. As a result, the Court concluded that "this case does not lend itself to a determination of damages simply based on sales made by a competitor which, but for the infringement, would have been made by the patent holder." *Id.; cf. Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1065 (Fed.Cir.1983) (lost profits theory generally used when parties to lawsuit are only suppliers in product market).[8] Similarly, in this case, Nyman used, rather than sold, the displays and enjoyed a monopsonistic position in relation to Trans-World. These facts make

---

6. *See supra* note 2.

7. The only evidence cited by Trans-World about embarrassment is a February 1, *1985,* letter from Nyman's counsel to the Court, asking that the injunction requiring recall of infringing displays be limited to eliminate "unnecessary embarrassment to defendants." Plaintiff's Proposed Findings of Fact, ¶ 59 (quoting Letter from Peter T. Cobrin to Judge Caleb M. Wright (Feb. 1, 1985)). This evidence says nothing about Nyman's attitude in 1981 towards a recall.

8. The *Stickle* court remanded the case to the district court for calculation of a reasonable royalty. 716 F.2d at 1563.

the lost profits theory proposed by Trans-World a patently inappropriate means to calculate damages.

■ An award of damages to Trans-World under the indirect method of calculating lost profits similarly must be rejected as too speculative. Under this method, the patent holder's damages are measured by the profits gained by the infringer through his wrongful application of the patent. *See Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc.,* 761 F.2d 649, 655 (Fed.Cir.) (using infringer's profits to estimate patent holder's lost profits), *cert. denied,* —— U.S. ——, 106 S.Ct. 230, 88 L.Ed.2d 229 (1985). However, there is no evidence in this case about what profits Nyman made, nor did either party present any credible evidence which breaks down the costs of the infringing display cases apart from the cost of the glasses. The Court would need such evidence before it could determine how much of Nyman's profits were attributable to the infringing displays. Indeed, neither Trans-World nor Nyman contends that the profits earned by Nyman on the sale of glasses from the infringing displays bear any direct relationship to the profits lost by Trans-World because of the infringement. *See* Letter from Harold Pezzner to Judge Caleb M. Wright (Sept. 30, 1985); Memorandum of Defendants With Respect to the Issues Raised by the Court in its Letter of August 9, 1985, at 7, Docket No. 153.[9]

In summary, the record is inadequate to allow the Court to determine the lost profits of Trans-World directly, through its calculations on anticipated profits, or indirectly, through the monetary benefit derived by Nyman from use of the infringing displays. The Court therefore must turn to the "royalty" method of calculating damages.

### B. Royalty Method

■ A court may use two types of royalty rates in calculating a damages award for patent infringement: an established royalty rate or a hypothetical rate embodying a reasonable royalty. The Court here cannot turn to any established royalty rate, because there is no evidence of any licensing experience by Trans-World in relation to Nyman or any other customer. The only alternative available to the Court is to determine a reasonable royalty.

The reasonable royalty concept was developed by the courts as a means of providing a just recovery to a patent owner who could not, for evidentiary or other reasons, prove lost profits or an established royalty. *See* 5 D. Chisum, Patents § 20.03[3] at 20–104 (1985). In reality, the reasonable royalty device is a legal fiction. "Created in an effort to compensate when profits are not provable, the reasonable royalty device conjures a willing licensor and licensee, who like Ghosts of Christmas Past, are dimly seen as negotiating a license. There is, of course, no actual willingness on either side, and no license to do anything, ..." *Panduit Corp. v. Stahlin Bros. Fibre Works,* 575 F.2d 1152, 1159 (6th Cir.1978). The setting of a royalty rate cannot be treated as the equivalent of ordinary license negotiations among the parties, because such treatment would validate the fiction that the infringement had never occurred. *Id.* at 1158.

The amount of the reasonable royalty depends on the facts of each case, as they are shown to the Court. *Id.* at 1159. Various courts have listed the factors which should be considered in setting a reasonable royalty, with the most extensive list being that set out in *Georgia-Pacific Corp. v. U.S. Plywood Corp.,* 318 F.Supp. 1116, 1120 (S.D.N.Y.1970) (*cited with approval* in *Stickle v. Heublein, Inc.,* 716 F.2d 1550, 1562 (Fed.Cir.1983)), *modified and aff'd. sub. nom., Georgia-Pacific Corp. v. U.S. Plywood-Champion Papers, Inc.,* 446 F.2d 295 (2d Cir.), *cert. denied,* 404 U.S. 870, 92

---

**9.** The Federal Circuit stated previously that evidence about Nyman's profits on eyeglass sales was relevant to calculation of a reasonable royalty. 750 F.2d at 1568. This Court has considered the meager evidence on this point, *see supra* p. 1052, but finds it insufficient to be of use in calculating a royalty rate.

S.Ct. 105, 30 L.Ed.2d 114 (1971); *see* 5 D. Chisum, Patents § 20.03[3][6], at 20–108–20–110 (1985). Unfortunately, nearly all of the *Georgia-Pacific* factors simply are beside the point in this case, given the lack of evidence in the record on many of the factors, the irrelevance of others, and the unique situation in which the infringement occurred. As a result, this Court must construct its own framework for calculating a reasonable royalty out of the evidentiary scraps found in the record.

The lost profits calculation proposed by Trans-World foundered in part because Trans-World's evidence provided no landmarks to navigate the gulf between the price that Trans-World wanted and the price Nyman was willing to pay: that is, there was no evidence which suggested how much more Trans-World would have lowered its price, if negotiations had continued, in order to get Nyman's business. If the Court approaches this problem from the opposite direction, however, it can find evidence which suggests a maximum price which Nyman would have paid for the displays. Assuming that Trans-World would have been willing to accept this price to get Nyman's business (and to earn profits at no opportunity cost[10]), the Court can derive a reasonable royalty rate.

Nyman had budgeted as a purchase price for a display about 50 cents per pair of glasses held by the display. Nearly all the infringing displays held 72 pairs of glasses, so the budget figure for these displays was $36. The Court finds that Nyman would have paid any manufacturer $36 to make the displays.[11] Nyman also was willing to pay Trans-World up to 15% more than other companies to manufacture the displays because Trans-World had prepared the designs. (T.R. C–77, D–31). The Court finds therefore that Nyman would have paid Trans-World $41.40 per unit ($36 × 115%) to manufacture the displays.

Assuming Nyman would have purchased the displays from Trans-World for $41.40 per unit, the Court next must determine what profit Trans-World would have made. The Court finds that Trans-World's usual price structure, embodying two mark-ups totalling 100% (or a doubling of costs) is a reasonable means to gauge its profits here. If Trans-World would have sold the displays for $41.40 apiece and this price reflected its usual 100% mark-up, Trans-World would have realized a profit of $20.70 per unit. The Court concludes that $20.70 per unit is a reasonable royalty in this case.

As discussed above, conflicting evidence exists about the number of infringing units purchased by Nyman. The Court finds that 3,968 infringing displays had been manufactured as of May 1982. This number is consistent with other evidence in the record relating to the number of displays: namely, Nyman's response to Trans-World's Interrogatory 3(b), Docket No. 12.[12] The lower number suggested by Nyman results from a review of invoices undertaken in 1985. Letter from Peter T. Cobrin to Judge Caleb M. Wright (Nov. 29, 1985). Where an infringer's failure to keep complete and accurate records prevents a court from determining accurately the number of infringing units involved, any uncertainty must be resolved against the infringer. *Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1065 (Fed.Cir.1983). The Court also finds that 366 additional infringing units were shipped between May

**10.** Opportunity cost is the cost involved in foregoing one alternative in order to do something else. P. Samuelson, Economics 475 (10th ed. 1976).

**11.** Approximately 275 of the infringing displays held more than 72 pairs of glasses, *see supra* note 2. However, neither party has suggested taking this fact into account, and the Court will use $36 as the price for all displays in its further calculations. *See Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1065 (Fed.Cir.1983) (dis-

trict court discounted number of infringing units by 10 percent to compensate for uncertainties).

**12.** Nyman's answer to Interrogatory 3(b), filed December 14, 1981, indicates that 2,968 infringing displays had been manufactured. Nyman employee James Kruszka updated this figure in his May 19, 1982 deposition: 1,000 additional infringing displays had been purchased between January and May 1982. *See* Deposition of James Kruszka 13, Docket No. 92.

1983 and April 1985. *See* Defendants' Response to Plaintiff's Fourth Set of Interrogatories (Nos. 25 and 26), ¶ 25, Docket No. 150. In summary, the Court finds that at least 4,334 infringing units have been manufactured. The "reasonable royalty" on this number of units comes to $89,-713.80 (4,334 units × $20.70 royalty per unit), exclusive of interest.

### C. Prejudgment Interest

■ Trans-World has requested that prejudgment interest be assessed on the award of damages. The Supreme Court decision in *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655, 103 S.Ct. 2058, 2062, 76 L.Ed.2d 211 (1983), makes clear that a court ordinarily should award prejudgment interest to ensure that the patent holder is placed in as good a position as that in which he would have been had the infringer entered into a reasonable royalty agreement. A court may refuse to award prejudgment interest in exceptional circumstances, such as where the patent holder has delayed unduly in prosecuting the lawsuit. *Id.* at 657, 103 S.Ct. at 2063. Nyman has not suggested that this case is one where prejudgment interest should be denied, and the Court will grant interest on the damages award.

Under 35 U.S.C. § 284, the district court has discretion to fix the rate of interest on the damages award, to award simple or compound interest, and to set the date from which interest began to accrue. The Court will award interest at the rates established under 26 U.S.C. § 6621. This provision requires that the Internal Revenue Service use the adjusted prime rate in compensating taxpayers for tax overpayments. *See Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1066 (Fed.Cir. 1983) (approving use of prime rate for award of prejudgment interest); *Bendix Corp. v. United States*, 676 F.2d 606, 616, 230 Ct.Cl. 247 (1982) (using rates set under § 6621 in patent infringement action brought under 28 U.S.C. § 1498).

The interest will be compounded daily. A patent holder's damages include "the foregone use of money," *Devex*, 461 U.S. at 656, 103 S.Ct. at 2063. Accrual of interest through daily compounding provides a consistent method to take into account the time value of money. M. Graetz, Federal Income Taxation: Principles and Policies 861 (1985). The I.R.S. must compound interest daily when calculating interest under 26 U.S.C. § 6621. *See* 26 U.S.C. § 6622. Congress dictated daily compounding in the taxation context to provide taxpayers with adequate compensation for the value of money and to conform computation of interest to commercial practice. *See* S.Rep. No. 494, 97th Cong., 2d Sess. 305 (report on Tax Equity and Fiscal Responsibility Act of 1982), *reprinted in* 2 1982 U.S.Code Cong. & Ad.News 781, 1046–47. Daily compounding of prejudgment interest on a damages award for patent infringement similarly will conform to commercial practice and provide the patent holder with adequate compensation for foregone royalty payments—i.e., the interest the patent holder could have earned had royalties been paid at the time of infringement. The Court concludes that only daily compounding complies with the *Devex* mandate to place the patent holder "in as good a position as he would have been in" had the parties negotiated a royalty agreement. 461 U.S. at 655, 103 S.Ct. at 2062; *cf. Dynamics Corp. of America v. United States*, 766 F.2d 518, 520 (Fed.Cir.1985) (compound interest necessary to provide just compensation to patent holder in proceeding under 28 U.S.C. § 1498).

The Court cannot be as precise as it would like in setting the date from which prejudgment interest began to accrue. Neither side offered into evidence information on the specific dates when shipments of infringing displays were made.[13] The Court, therefore, must make do with incomplete evidence and base its interest calculations on the dates when information on the existence of infringing displays went on the record in this case. Nyman's answer to

---

**13.** This information evidently was in the possession of both sides. *See supra* note 2.

Plaintiff's Interrogatory 3(b), which mentions 2968 infringing displays, was filed December 14, 1981. *See* Docket No. 12. Interest on the $61,437.60 royalty owed on these displays began accruing as of December 14, 1981. A Nyman employee deposed on May 19, 1982, stated that Nyman had procured 1000 more infringing displays since the interrogatory answer was filed. *See* Deposition of James Kruszka 12–13, Docket No. 92. Interest on the additional $20,700.00 royalty owed on these 1000 displays began accruing on May 19, 1982. Nyman's response to Interrogatory 25, stating that 366 additional infringing units had been obtained since the May 1983 trial, was filed on April 24, 1985. *See* Docket No. 150. Interest on the $7576.20 royalty owed on this last group of infringing displays began accruing on April 24, 1985.

The chart attached as Appendix A sets forth the Court's calculation of prejudgment interest as of April 9, 1986.

## III. MISCELLANY

▮ Several other matters command the Court's attention at this time. This Court, upon the order of the Federal Circuit, *see* 750 F.2d at 1565, enjoined Nyman from using the infringing displays and required that any displays be recalled from Nyman's customers. *See* Amended Final Judgment Except for Accounting, ¶ 4, Docket No. 144. However, the Federal Circuit stated that this injunction should be lifted if the damages award were based on a flat fee or license for use of the patent. 750 F.2d at 1565. The reasonable royalty calculated by the Court effectively grants Nyman a license to use the infringing displays it has purchased, and the Court concludes that the injunction against use should end. Upon filing satisfaction of the judgment to be entered herein (excluding any attorneys' fees or enhanced damages which may be awarded), the permanent injunction will be dissolved insofar as it enjoins use of the infringing displays.

The Court also must address briefly the issues of attorneys' fees and enhanced damages. Motions on these topics were held in abeyance pending calculation of the amount of simple damages. *See* Amended Final Judgment Except for Accounting, ¶ 9, Docket No. 144. Now that the Court has worked out a simple damages figure, it can consider the possibility of awarding attorneys' fees and enhanced damages. Counsel should report to the Court by April 23, 1986, on a schedule for submission of any motions and briefs on these topics.

An order will enter in accordance with this opinion.

## APPENDIX A

Trans-World Prejudgment Interest (Compounded Daily)

| Time period | Units | New award | Principal | Rate | Days | Interest |
|---|---|---|---|---|---|---|
| 12/14/81–1/31/82 | 2,968 | $61,437.60 | $ 61,437.60 | 12% | 49 | $ 997.58 |
| 2/1/82–5/18/82 | 2,968 | | 62,435.18 | 20% | 107 | 3,768.96 |
| 5/19/82–12/31/82 | 3,968 | 20,700.00 | 86,904.14 | 20% | 226 | 11,453.22 |
| 1/1/83–6/30/83 | 3,968 | | 98,357.36 | 16% | 181 | 8,120.01 |
| 7/1/83–12/31/83 | 3,968 | | 106,477.37 | 11% | 184 | 6,070.22 |
| 1/1/84–12/31/84 | 3,968 | | 112,547.59 | 11% | 366 | 13,122.60 |
| 1/1/85–4/24/85 | 3,968 | | 125,670.19 | 13% | 114 | 5,206.61 |
| 4/24/85–6/30/85 | 4,334 | 7,576.20 | 138,453.00 | 13% | 67 | 3,343.04 |
| 7/1/85–12/31/85 | 4,334 | | 141,796.04 | 11% | 184 | 8,083.72 |
| 1/1/86–4/9/86 | 4,334 | | 149,879.77 | 10% | 99 | 4,120.29 |
| Totals: | 4,334 | $89,713.80 | | | | $64,286.26 |

Total (including interest): $154,000.06

Interest compounded daily using the formula: $P_1 = P_0 (1+1/n)^{mn}$,

where $P_0$ = beginning principal
$P_1$ = principal + interest at end of time period
$i$ = interest rate
$n$ = number of times compounded (daily = 365)
$m$ = number of years (or fraction of year)