The CARBORUNDUM COMPANY d/b/a Metaullics Systems Division and Metaullics Systems Co. L.P., Plaintiffs/Cross–Appellants,

v.

MOLTEN METAL EQUIPMENT INNOVATIONS, INC. and Paul V. Cooper, Defendants–Appellants.

Nos. 94–1298, 94–1342, 95–1015, 95–1024, 95–1032, 95–1033.

United States Court of Appeals, Federal Circuit.

Dec. 19, 1995.

Gordon D. Kinder, Renner, Otto, Boisselle & Sklar, Cleveland, Ohio, argued for plaintiffs/cross-appellants. With him on the brief was Jay R. Campbell. Of counsel was Donald L. Otto.

John R. Fuisz, Nikaido, Marmelstein, Murray & Oram, Washington, DC, argued for defendants-appellants. With him on the brief was John H. Harman, Silver Springs, Maryland. Of counsel were Ronald H. Isroff, Cleveland, Ohio, Robert L. Waddle, New Orleans, Louisiana, and Timothy J. Downing, Cleveland, Ohio.

Before NEWMAN, LOURIE, and BRYSON, Circuit Judges.

LOURIE, Circuit Judge.

Molten Metal Equipment Innovations, Inc. and Paul V. Cooper (collectively "MMEI") appeal from the decisions and orders of the United States District Court for the Northern District of Ohio in which the court entered a permanent injunction against MMEI based on a jury verdict of infringement of U.S. Patent 4,169,584 (the '584 patent), which is owned by the Carborundum Company d/b/a Metaullics Systems Division and Metaullics Systems Co. L.P. (collectively "Metaullics"); granted Metaullics' motion for judgment as a matter of law on MMEI's implied license defense; denied MMEI's motion to modify the permanent injunction; and held MMEI in civil contempt for violation of the court's injunction. *Carborundum Co. v. Molten Metal Equip. Innovations, Inc.*, No. 1:92 CV 2106 (N.D.Ohio April 21, 1994) (issuing permanent injunction against MMEI); *Carborundum Co. v. Molten Metal Equip. Innovations, Inc.*, No. 1:92 CV 2106 (N.D.Ohio April 22, 1994) (granting judgment as a matter of law for Metaullics on MMEI's implied license defense); *Carborundum Co. v. Molten Metal Equip. Innovations, Inc.*, No. 1:92 CV 2106 (N.D.Ohio May 4, 1994) (denying MMEI's motion to modify the permanent injunction); *Carborundum Co. v. Molten Metal Equip. Innovations, Inc.*, No. 1:92 CV 2106 (N.D.Ohio September 6, 1994) (holding MMEI in civil contempt). Metaullics cross-appeals, challenging the amount of damages awarded based on the court's contempt finding. We affirm.

BACKGROUND

Metaullics manufactures and sells equipment used in various systems in the aluminum industry, including molten metal purification systems. These purification systems introduce gases into molten metal in order to remove dissolved gases, such as hydrogen, or dissolved metals, such as magnesium, from the molten metal. These gases chemically react with the impurities to form a compound that either floats to the surface of the molten metal and is skimmed off or is released from the molten metal into the atmosphere.

Metaullics owns the '584 patent for a "Gas Injection Apparatus," which issued on October 2, 1979.[1] The invention is directed to a complete system for melting scrap metal and removing impurities from the metal. Metaullics does not have a patent on any of the individual elements of the claimed system. Claim 1, the only independent claim at issue, defines the invention as follows:

1. A gas injection apparatus for introducing gas into molten metal, comprising:

(1) a reverberatory furnace;

(2) means within said reverberatory furnace for pumping metal through a metal transfer conduit, said pumping means having a pumping capacity of at least 4000 lbs/min, said metal transfer conduit being at least partially submerged in a metallic bath;

(3) a two-ended gas injection conduit having one end submerged within the metallic bath and connected to the metal transfer conduit, the gas injection conduit being so constructed and arranged that the metal is pumped past the submerged end of the gas injection conduit so as to contact the gas within the gas injection conduit connected to the metal transfer conduit, the gas injection conduit having an unsubmerged end opposite the submerged end of the gas injection conduit; and

(4) means for providing gas to be introduced into the molten metal into the

1. The inventor assigned the patent to the Carborundum Company d/b/a Metaullics Systems Division. During the pendency of this action, the Carborundum Company sold its assets, including the '584 patent, to Metaullics Systems Co. L.P.

unsubmerged end of the gas injection conduit.

Instead of selling the entire apparatus as claimed in the '584 patent, Metaullics sells a pump with a metal transfer conduit and a gas injection conduit. The pump is designed specifically for use in the system described in the '584 patent. Metaullics does not sell a reverberatory furnace or a gas supply. When it sells its pump, Metaullics does not provide any notice of the '584 patent or place any restrictions on its customers' use of the pump.

In addition to selling pumps, Metaullics sells replacement parts for its pumps. Because a portion of the pump is submerged in molten metal, certain parts of the pump must be made of a nonmetallic material, such as graphite or ceramic. Although these parts are more durable in molten metal than metal parts, they still require frequent replacement. In fact, Metaullics estimates that it costs about $35,000.00 a year in replacement parts for a pump that initially cost between $8,000.00 and $20,000.00.

MMEI also sells molten metal pumps, the "WORKHORSE" and "MONSTER" pumps, and replacement parts for those pumps.[2] Most of MMEI's pump sales in this case were to customers who previously purchased a Metaullics pump and then replaced it with an MMEI pump.[3] MMEI does not dispute that Metaullics' customers substituted the MMEI pump for the Metaullics pump and continued to use the apparatus of the '584 patent.

■ On October 7, 1992, Metaullics sued MMEI, alleging that the sale of MMEI's pumps constituted contributory infringement and inducement of infringement under 35 U.S.C. §§ 271(b) and (c) (1988). Beginning on April 5, 1994, the court held a bifurcated trial in which the issues of infringement and damages were tried separately to the same

jury. At the close of the evidence in the liability phase of the trial, Metaullics moved for judgment as a matter of law on MMEI's defense that its customers did not directly infringe the '584 patent.[4] See Fed.R.Civ.P. 50. The court granted Metaullics' motion and directed a verdict in favor of Metaullics on MMEI's implied license defense. *Carborundum Co. v. Molten Metal Equip. Innovations, Inc.,* No. 1:92 CV 2106 (N.D.Ohio April 22, 1994). In particular, the court held that Metaullics' initial sale of a pump did not grant its customers an implied license to use the apparatus of the '584 patent for the life of the patent. *Id.,* slip op. at 3. The court determined that when Metaullics sold a pump, the customer received an implied license under the '584 patent for the life of the purchased pump. *Id.,* slip op. at 5. Therefore, the court held that Metaullics' customers would infringe the '584 patent when they placed MMEI's pump into their metal purification systems.

The jury then returned a verdict finding MMEI liable for contributory infringement and inducement to infringe independent claim 1 and dependent claims 4, 5, 6, 7, and 8. Before the damages phase of the trial, the court entered a permanent injunction pursuant to the jury's verdict. *Carborundum Co. v. Molten Metal Equip. Innovations, Inc.,* No. 1:92 CV 2106 (N.D.Ohio April 20, 1994). The injunction prevented MMEI from selling any pumps or replacement parts for those pumps used in infringing systems. *Id.,* slip op. at 2. In response to concerns that MMEI's customers would be unable to immediately convert their systems to noninfringing systems, the court modified the injunction to allow MMEI to sell replacement parts during a two-week grace period until May 4, 1994. *Carborundum Co. v. Molten Metal Equip. Innovations, Inc.,* No. 1:92 CV 2106 (N.D.Ohio April 21, 1994). However, the court explicitly admonished the president of MMEI that "extending this time did not

---

2. MMEI does not sell the entire system as claimed in the '584 patent. Nor does it sell replacement parts for *Metaullics* pumps.

3. Apparently, MMEI also sold some pumps to customers who had not previously purchased a pump from Metaullics. MMEI does not assert that those customers have an implied license.

4. Absent direct infringement of the claims of a patent, there can be neither contributory infringement nor inducement of infringement. *Met–Coil Sys. Corp. v. Korners Unlimited, Inc.,* 803 F.2d 684, 687, 231 USPQ 474, 476 (Fed.Cir. 1986).

mean that [the court] was condoning him . . . to unload all of his graphite parts on [MMEI's customers] between now and May 4th."

During the subsequent damages phase of the trial, Metaullics presented evidence of damages consisting of lost profits caused by MMEI's past sales of infringing pumps and repair parts. Because the permanent injunction prohibited MMEI from selling parts for its pumps, Metaullics did not seek damages for lost profits on future sales of repair parts. The jury returned a verdict in favor of Metaullics for $254,421.00.

After the trial on damages, MMEI again challenged the scope of the injunction by filing a motion to modify the injunction. MMEI argued that once it compensated Metaullics for its infringement, it obtained an implied license to use *and repair* its pumps. The court disagreed, stating:

> Metaullics presented its case on damages, seeking convoyed sales of pump parts only through April 15, 1994, in reliance on an injunction prohibiting sales of spare parts in the future. A finding now that by paying Metaullics the profit on . . . prior pump sales, MMEI will have purchased a license to use those pumps for their life, would be highly inequitable to Metaullics in light of Metaullics's damages case. This Court will not modify the injunction in light of this unfairness to the patentee.

*Carborundum Co. v. Molten Metal Equip. Innovations, Inc.*, No. 1:92 CV 2106, slip op. at 8 (N.D.Ohio May 4, 1994).

After MMEI filed a notice of appeal of the court's order refusing to modify the injunction, MMEI moved under Federal Rule of Appellate Procedure 8 to stay the portion of the permanent injunction relating to the sale of parts, pending resolution of its appeal. In a nonprecedential order, we granted the stay. *Carborundum Co. v. Molten Metal Equip. Innovations, Inc.*, No. 94–1298 (Fed.Cir. June 27, 1994).

During pendency of the appeal concerning the court's refusal to modify the injunction, the district court issued an order requiring MMEI to show cause why it should not be held in contempt of the court's permanent injunction. In its show cause order, the court expressed concern that MMEI had violated the injunction by selling an excessive number of parts during the grace period.[5] After a hearing, the court held MMEI in civil contempt based upon MMEI's parts sales on May 3 and 4, 1994. *Carborundum Co. v. Molten Metal Equip. Innovations, Inc.*, No. 1:92 CV 2106, slip op. at 2 (N.D.Ohio September 6, 1994). The court found that MMEI had sold almost as many parts during the last two days of the grace period as it had sold during the rest of the two weeks. *Id.,* slip op. at 17. Moreover, the court found that MMEI had not converted a single pump to a noninfringing design during the grace period. *Id.,* slip op. at 18. Therefore, the court awarded remedial damages in excess of $23,000.00 for MMEI's sales on May 3 and 4. In addition, the court awarded Metaullics its attorney fees and costs in connection with the contempt proceeding. MMEI appeals these findings. Metaullics cross-appeals, challenging the amount of damages awarded pursuant to the contempt proceeding. All appeals were consolidated pursuant to Federal Rule of Appellate Procedure 3(b).

## DISCUSSION

### 1. *Implied License*

 On appeal, MMEI challenges the court's decision to grant Metaullics' motion for judgment as a matter of law on MMEI's implied license defense. In doing so, MMEI does not contest any of the underlying facts; rather, MMEI only contests the court's conclusion that Metaullics' customers did not have an implied license to use the apparatus claimed in the '584 patent with pumps purchased from MMEI. Whether there existed an implied license is a question of law. *Met–Coil Sys. Corp. v. Korners Unlimited, Inc.*, 803 F.2d 684, 687, 231 USPQ 474, 476 (Fed. Cir.1986). Under these circumstances, in

---

**5.** The sales that were alleged to have violated the court's permanent injunction occurred prior to our decision staying the injunction.

which the only issue is one of law to be applied to an undisputed set of facts, we have plenary review of the court's decision. *See Newell Cos. v. Kenney Mfg. Co.*, 864 F.2d 757, 765, 9 USPQ2d 1417, 1424 (Fed.Cir. 1988) (court's conclusion as to obviousness when there are no genuine issues of material fact is subject to plenary review), *cert. denied*, 493 U.S. 814, 110 S.Ct. 62, 107 L.Ed.2d 30 (1989).

MMEI argues that Metaullics' sale of the pumps, which had no other use than in the '584 gas injection apparatus, resulted in an unrestricted implied license to practice the invention for the entire term of the '584 patent. MMEI further asserts that restrictions on an implied license cannot be implied, but must be express. Because Metaullics placed no express restrictions on the use of the pumps, MMEI posits that Metaullics' customers obtained an unrestricted implied license to practice the invention. Thus, according to MMEI, customers who replaced a Metaullics pump with an MMEI pump could not be direct infringers under the unrestricted implied license. Absent direct infringement, MMEI argues that it could not contribute to or induce infringement. Although we agree with MMEI that Metaullics' customers had an implied license to practice the invention claimed in the '584 patent, we disagree as to the scope and meaning of that license.

 A patent grants its owner the right to exclude others from making, using, or selling the patented invention. 35 U.S.C. § 154 (1988). However, all or part of the right to exclude may be waived by granting a license, which may be express or implied. *See Spindelfabrik Suessen–Schurr Stahlecker & Grill GmbH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft*, 829 F.2d 1075, 1081, 4 USPQ2d 1044, 1048 (Fed.Cir. 1987) ("[A] patent license agreement is in essence nothing more than a promise by the licensor not to sue the licensee."), *cert. denied*, 484 U.S. 1063, 108 S.Ct. 1022, 98 L.Ed.2d 987 (1988). Although most licenses are express, a license may be implied, *see Met–Coil*, 803 F.2d at 686–87, 231 USPQ at 476–77 (sale of nonpatented equipment to practice patented invention results in implied

license), and an implied license, like an express license, is a defense to patent infringement. If Metaullics' customers had an implied license to practice the invention for the full patent term, then MMEI would not be liable for either contributory infringement or inducement to infringe. *See Met–Coil*, 803 F.2d at 687, 231 USPQ at 477. As the alleged infringer, MMEI had the burden of establishing the existence of an implied license as an affirmative defense. *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 924, 223 USPQ 982, 998 (Fed.Cir.1984).

 In *Met–Coil Systems Corp. v. Korners Unlimited, Inc.*, 803 F.2d 684, 231 USPQ 474 (Fed.Cir.1986), we noted two requirements for the grant of a license implied by the sale of nonpatented equipment used to practice a patented invention. First, "the equipment involved must have no noninfringing uses." *Id.* at 686, 231 USPQ at 476. Second, "the circumstances of the sale must 'plainly indicate that the grant of a license should be inferred.'" *Id.* (quoting *Bandag*, 750 F.2d at 925, 223 USPQ at 998). Our inquiry does not end, however, once we determine that a license should be implied. We must further look to the circumstances of the sale to determine the scope of the implied license. *See Edison Elec. Light Co. v. Peninsular Light, Power & Heat Co.*, 101 F. 831, 836 (6th Cir.1900) ("It is evident that the extent of an implied license must depend upon the peculiar facts of each case."). This determination must be based on what the parties reasonably intended as to the scope of the implied license based on the circumstances of the sale. One party's unilateral expectations as to the scope of the implied license are irrelevant. *Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1559, 219 USPQ 377, 383 (Fed.Cir.1983).

 Our analysis in this case is simplified because Metaullics and MMEI agree that the pumps sold by Metaullics have no noninfringing uses. Moreover, the parties do not contest that a license should be implied. Rather, the parties dispute the scope of the implied license granted by Metaullics when it sold its pumps. MMEI argues that the license granted extends to the life of the patent; Metaullics argues that the term of the

license under the '584 patent is limited to the life of the pump.

 Here, Metaullics sold an unpatented pump;[6] the only use of the pump was in the metal purification apparatus of the '584 patent. Metaullics did not place any express restrictions on its customers as to the use of the pump. The circumstances of such a sale plainly indicate that a license should be implied under the apparatus patent. Metaullics and its customers are presumed to have intended that at the time the customer purchased the pump, the customer was free to use it for its intended purpose to practice the invention claimed in the '584 patent. · In order to do so, Metaullics' customers were free to purchase a reverberatory furnace and a gas supply from any source because these components were necessary to practice the licensed invention. Otherwise, the pump was worthless because it had no other practical use. Moreover, once Metaullics sold the pump without restriction, the parties to the sale were presumed to have intended that the purchaser was free to repair it with parts obtained from any source.[7] However, Metaullics and its customers cannot be presumed to have intended that under these circumstances the implied license extended beyond the life of the pump. Unless the circumstances indicate otherwise, an implied license arising from sale of a component to be used in a patented combination extends only for the life of the component whose sale and purchase created the license.

MMEI cites the testimony of the president of Metaullics during the damages phase of the trial in which he testified that:

> Up until about a year ago, maybe a year and a half ago, the first pump that a customer would purchase from Metaullics had a premium charge of anywhere from a thousand to, say, $1700 which ostensibly was for engineering, any engineering charges. That premium then is not charged for any future pumps. You could argue that that is the premium for the

right to use the patent. Although we never described it as such to the customer.

MMEI argues that this initial payment constituted a one-time royalty for a license to practice the invention claimed in the '584 patent for the life of the patent.

This testimony was not before the court during the liability phase of the trial and it therefore cannot support a finding of error in the district court's decision concerning that phase of the trial. *See Rolls–Royce Ltd. v. GTE Valeron Corp.*, 800 F.2d 1101, 1108, 231 USPQ 185, 190 (Fed.Cir.1986) ("An appeal is not a means for counsel to cure mistakes and omissions made at trial."). Moreover, the upfront payment in this case appears to have been more akin to a first time engineering charge. In an appropriate case, an upfront payment may be evidence establishing the existence of a license under a relevant patent. However, in view of the initial cost to purchase the pumps ($8,000.00 to $20,000.00) and the even greater cost for repair parts ($35,000.00/year), we do not believe that the $1,700.00 constituted a one-time royalty payment for an implied license to practice the '584 invention for the life of the patent with any pump as MMEI asserts.

 Different circumstances might have led to a different result. Metaullics presumably had the option to sell the entire apparatus claimed in the '584 patent. Such a sale would have created an implied license for the useful life of the apparatus. *See Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568, 27 USPQ2d 1136, 1138 (Fed.Cir.1993) ("The law is well settled that an authorized sale of a patented product places that product beyond the reach of the patent."), *cert. denied*, —— U.S. ——, 114 S.Ct. 923, 127 L.Ed.2d 216 ; (1994). Such a sale would also have provided the right to repair the apparatus. *See Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 346, 81 S.Ct. 599, 604–05, 5 L.Ed.2d 592, 128 USPQ 354, 359 (1961) ("Mere replacement of individual unpatented

---

**6.** The pump sold by Metaullics included a molten metal pump with an attached metal transfer conduit and gas injection conduit. Metaullics' pump, without the two conduits, was claimed in a patent that expired in 1977.

**7.** Metaullics does not attempt to prevent MMEI from selling repair parts for Metaullics pumps. In fact, Metaullics customers purchase approximately 40% of repair parts from sources other than Metaullics.

parts ... is no more than the lawful right of the owner to repair his property."). Metaullics' customers would have had the right to replace the pump with one purchased from another source such as MMEI.

■ However, Metaullics chose to market its invention by selling only the pump. In doing so, it chose to forego revenue from sales of the reverberatory furnace, the gas supply, and any other equipment necessary to practice the invention. Under the circumstances, there is no basis to believe that the parties to the initial sales transaction intended that Metaullics' customers would have an implied license to use the apparatus claimed in the '584 patent for the life of the patent. A patentee is generally entitled to determine how it wishes to commercialize its invention in order to optimize its economic benefit from the patent grant. *See General Talking Pictures Corp. v. Western Elec. Co.*, 305 U.S. 124, 127, 59 S.Ct. 116, 117, 83 L.Ed. 81 (1938) ("[T]he patentee may grant a license 'upon any condition the performance of which is reasonably within the reward which the patentee by the grant of the patent is entitled to secure.' ") (quoting *United States v. General Elec. Co.*, 272 U.S. 476, 489, 47 S.Ct. 192, 196–97, 71 L.Ed. 362 (1926)); *cf. Rite–Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1544–49, 35 USPQ2d 1065, 1068–72 (Fed.Cir.) (in banc) (awarding lost profits on sales of devices that competed with the infringing device but were not covered by the patent in suit), *cert. denied*, —— U.S. ——, 116 S.Ct. 184, 133 L.Ed.2d 122 (1995). Metaullics chose to sell only the pump, not the entire patented apparatus. We hold that the implied license extended only for the life of the pump.

Our holding is not inconsistent with our precedent. In *Met–Coil*, the patentee, Met–Coil, invented a method and apparatus for connecting metal ducts used in heating and air-conditioning systems. *Met–Coil*, 803 F.2d at 685, 231 USPQ at 475. Met–Coil sold an unpatented "roll-forming" machine and unpatented metal pieces, which were used together to practice the claimed invention. Neither the machine nor the metal pieces had uses other than in the invention. We held that the patent owner's unrestricted sale of the "roll-forming" machine, useful

only in performing the claimed process and producing the claimed product, carried with it an implied license under the patent. *Id.* at 687, 231 USPQ at 476. However, we did not hold that the sale resulted in an implied license to practice the patentee's invention with *any* "roll-forming" machine for the entire term of the patent. Rather, Met–Coil and its customers could only practice the invention for the life of the "roll-forming" machine purchased from the patentee. *See United States v. Univis Lens Co.*, 316 U.S. 241, 250–51, 62 S.Ct. 1088, 1093–94, 86 L.Ed. 1408 (1942) ("[W]here one has sold an uncompleted article which, because it embodies essential features of his patented invention, is within the protection of his patent, and has destined the article to be finished by the purchaser in conformity to the patent, he has sold his invention so far as it is or may be embodied in that particular article.").

■ MMEI finally argues that restrictions to an implied license must be express. However, limiting an implied license created by the sale of a component to the life of that component is not a restriction. The limitation is inherent in the nature of the product that is sold, in this case a component, not the entire apparatus. A patentee is not required to express restrictions in conjunction with the sale of a device when the excluded activities are clearly beyond the scope of the implied license.

We agree with the district court's conclusion that Metaullics' customers did not have an implied license to practice the invention claimed in the '584 patent with pumps purchased from MMEI. Thus, we affirm the court's decision granting Metaullics' motion for judgment as a matter of law on MMEI's implied license defense.

### 2. *Permanent Injunction*

■ MMEI further challenges the permanent injunction entered by the district court in which the court precluded MMEI from selling repair parts to customers who previously purchased MMEI pumps. A court may grant an injunction "in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable."

35 U.S.C. § 283 (1988). Courts have broad discretion in determining the scope of injunctive relief. *Ortho Pharmaceutical Corp. v. Smith*, 959 F.2d 936, 945, 22 USPQ2d 1119, 1127 (Fed.Cir.1992). Thus, we review a district court's decision granting, denying, or modifying an injunction for an abuse of discretion. *Id.*

MMEI argues that the district court abused its discretion in denying its motion for modification of the permanent injunction to permit the sale of repair parts to customers for whom MMEI paid damages. In support, MMEI argues that by compensating Metaullics for MMEI's infringement with lost profits damages on the pumps, or by posting a bond that guaranteed payment of such damages, MMEI obtained an implied license for its customers to repair those pumps. Therefore, MMEI asserts that the court should have modified the injunction to allow MMEI to sell repair parts to those customers.

Metaullics counters that the court properly denied MMEI's motion because Metaullics would not have been fully compensated for all future harm it will suffer if no injunction had been granted. Metaullics argues that it did not receive compensation for *future* repair parts sales during the trial on damages because the injunction had been granted. Thus, Metaullics asserts that the court did not abuse its discretion when it failed to modify the injunction. We agree with Metaullics.

 The patent statute provides for damages "adequate to compensate for the infringement." 35 U.S.C. § 284 (1988). The primary purpose of compensatory damages is to return the patent owner to the financial position he would have occupied but for the infringement. *See Rite–Hite*, 56 F.3d at 1545, 35 USPQ2d at 1069 ("The general rule for determining actual damages to a patentee ... is to determine the sales and profits lost to the patentee because of the infringement."). Courts also have the discretion to issue an injunction to prevent the violation of patent rights when equity so requires. 35 U.S.C. § 283 (1988). Although courts have broad discretion in determining appropriate relief for patent infringement, and injunctions are usually granted after a finding of infringement, "[i]njunctions and damages must be tailored to the circumstances and be correlatively determined." *Stickle*, 716 F.2d at 1563, 219 USPQ at 386 (Fed.Cir.1983). For example, once a patentee has been fully compensated by an infringer for the use of a device embodying the patented invention, a court may not grant an injunction preventing the infringer from using or repairing that device. *See, e.g., King Instrument Corp. v. Otari Corp.*, 814 F.2d 1560, 1564, 2 USPQ2d 1201, 1204, (Fed.Cir.1987) (stating that defendant is entitled to sell unpatented parts used to repair infringing devices for which patentee has been fully compensated); *Stickle*, 716 F.2d at 1563, 219 USPQ at 386 ("Upon receiving full compensation for the making and using of existing infringing fryers, appellees are not thereafter entitled to enjoin use of such fryers."). As the Supreme Court noted in *Union Tool Co. v. Wilson:*

> A patentee, in demanding and receiving *full compensation* for the wrongful use of his invention in devices made and sold by a manufacturer adopts the sales as though made by himself, and therefore, necessarily licenses the use of the devices, and frees them from the monopoly of the patent.

259 U.S. 107, 113, 42 S.Ct. 427, 429, 66 L.Ed. 848 (1922) (emphasis added).

 Here, the district court determined, and MMEI does not challenge, that Metaullics proved entitlement to lost profits for the sale of pumps *and* what the court referred to as convoyed sales of repair parts.[8] *Carborundum Co. v. Molten Metal Equip. Innovations, Inc.*, No. 1:92 CV 2106, slip op. at 5 (N.D.Ohio May 4, 1994). Although the court held that Metaullics was clearly entitled to lost profits on all spare parts sales, Metaullics did not attempt to obtain damages for

---

**8.** The expression "convoyed sales" should preferably be limited to sales made simultaneously with a basic item; the spare parts here should best be called "derivative sales." *See Georgia–Pacific Corp. v. United States Plywood Corp.*, 318 F.Supp. 1116, 1120, 166 USPQ 235, 238 (S.D.N.Y.1970), *modified and aff'd*, 446 F.2d 295, 170 USPQ 369 (2d Cir.), *cert. denied*, 404 U.S. 870, 92 S.Ct. 105, 30 L.Ed.2d 114 (1971).

*future* repair parts sales because the injunction prohibited MMEI from selling parts. *Carborundum Co. v. Molten Metal Equip. Innovations, Inc.*, No. 1:92 CV 2106, slip op. at 6 (N.D.Ohio May 4, 1994). Rather, Metaullics sought and received damages only through April 15, 1994, for *past* sales of repair parts. Thus, Metaullics was not fully compensated for the infringement because the damages award did not include future lost sales of repair parts for which Metaullics had established entitlement.

Moreover, the district court's decision not to modify the injunction is further supported by MMEI's failure to object to the scope of the permanent injunction before the damages phase of the trial. Although MMEI requested a two-week grace period to sell repair parts prior to converting its customers to noninfringing systems, it did not otherwise challenge the scope of the injunction before the damages phase of the trial. Any objection by MMEI to the court's injunction prohibiting the sale of parts should have been raised before the damages phase of the trial. Under all these circumstances, the court did not abuse its discretion when it denied MMEI's motion to modify the injunction.[9]

Contrary to MMEI's assertion, our decision is not inconsistent with our prior decisions involving similar circumstances, including *King Instrument Corp. v. Otari Corp.*, 814 F.2d 1560, 2 USPQ2d 1201 (Fed.Cir. 1987). In *King Instrument*, the district court awarded the patentee lost profits caused by the sale of an infringing machine and repair parts for that machine. *King Instrument*, 814 F.2d at 1561, 2 USPQ2d at 1202. The court further granted an injunction that precluded the future sale of spare parts by the defendant. *Id.* On the first appeal to our court, we affirmed the lost profits award, but held that the patentee had failed to prove entitlement under the "entire

market value" rule to damages for the sale of spare parts. *King Instrument Corp. v. Otari Corp.*, 767 F.2d 853, 866, 226 USPQ 402, 411 (Fed.Cir.1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1197, 89 L.Ed.2d 312 (1986). On remand, the district court entered a modified judgment confirming the original lost profits damages and continuing the injunction. Prior to the new trial on damages, the patentee appealed the modified judgment to our court. We vacated the court's injunction, holding that the defendant was "entitled to sell its customers unpatented spare parts attributable to repair of those infringing devices for which [the patentee] has been fully compensated." *King Instrument*, 814 F.2d at 1564, 2 USPQ2d at 1204.

Our holding in *King Instrument*, however, does not require that we vacate the injunction as to spare parts sales in this case. Unlike Metaullics, the patentee in *King Instrument* failed to prove entitlement to lost profits on the sale of repair parts. This court concluded that the patentee had been fully compensated for its proven damages and accordingly the court vacated the injunction as to the spare parts. Notably, the court left open the possibility that the district court could modify the injunction on remand:

> [I]t seems better to vacate, in this present injunction, all reference to spare parts—at least until the District Court has made its determination (on remand) as to spare parts damages. The future coverage of the injunction can then be considered anew.

*Id.*

In summary, the district court in this case did not abuse its discretion when it declined to modify its injunction. Accordingly, we vacate our stay and affirm the district court's decision not to modify the injunction.

9. We recognize that this result places some hardship on Metaullics' customers, who may have to replace a pump purchased from MMEI with either a noninfringing pump or a pump sold by Metaullics. Moreover, Metaullics also stands to gain additional pump sales because its customers cannot repair MMEI's pumps with repair parts purchased from MMEI. These were clearly factors the court must have considered when determining whether to grant an injunction "in accordance with the principles of equity." 35 U.S.C. § 283 (1988). We cannot fault the district court's decision that it "would be highly inequitable [to modify the injunction] in light of Metaullics's damages case." *Carborundum Co. v. Molten Metal Equip. Innovations, Inc.*, No. 1:92 CV 2106, slip op. at 8 (N.D.Ohio May 4, 1994). These consequences are the inevitable fallout resulting from a holding of patent infringement.

### 3. *Contempt*

Both parties assert error in the district court's decision in the subsequent contempt proceedings. We review a district court's finding of contempt for an abuse of discretion. *KSM Fastening Sys., Inc. v. H.A. Jones Co.,* 776 F.2d 1522, 1532, 227 USPQ 676, 684 (Fed.Cir.1985).

On appeal, MMEI asserts that it cannot be found to be in contempt because the court's injunction should not have prevented MMEI from selling repair parts. We have held to the contrary in the previous section of this opinion. However, even if we were to accept MMEI's argument, MMEI was not free to ignore the court's order as it did. *See GTE Sylvania, Inc. v. Consumers Union,* 445 U.S. 375, 386, 100 S.Ct. 1194, 1201, 63 L.Ed.2d 467 (1980) ("[P]ersons subject to an injunctive order issued by a court with jurisdiction are expected to obey that decree until it is modified or reversed, even if they have proper grounds to object to the order."). Therefore, the court did not abuse its discretion when it held MMEI in contempt.[10]

On cross-appeal, Metaullics argues that the court erred in finding MMEI in contempt for only the last two days of the grace period provided for sale of parts before initiation of the injunction. In doing so, Metaullics asserts that there was no factual basis for excluding any of MMEI's sales during the entire two-week period. We disagree. In its decision, the court carefully considered all the evidence and found that almost half of MMEI's sales during the grace period occurred in the last two days. This was sufficient evidence to support the court's conclusion that only the last two days of sales were contemptuous. The court thus did not abuse its discretion.

### CONCLUSION

We affirm the decision of the district court granting Metaullics' motion for judgment as a matter of law on MMEI's implied license defense. Further, we conclude that the

court did not abuse its discretion when it denied MMEI's motion to modify the permanent injunction. We also find no error in the court's contempt findings.

### *AFFIRMED.*

---

10. We note that the court's permanent injunction did not limit the number of sales MMEI could make during the grace period. However, the judge made it clear to MMEI during the proceedings that it could not unload all its parts during the grace period.